Richard PRICE; Dwain Henderson; Lucinda Watson; George Baker; Lance White; Stanford Cobbs; Stockton Metro Ministry, Inc., Plaintiffs–Appellees,

v.

CITY OF STOCKTON; Stockton City Council; Stockton Redevelopment Agency; Stockton Department of Housing and Redevelopment; Steve Pinkerton; Mark Lewis; Gary Podesto; Leslie Martin; Richard Nickerson; Larry Ruhstaller; Gary Giovanetti; Ann Johnston; Gloria Nomura, Defendants–Appellants.

Nos. 02–16155, 02–16270.

United States Court of Appeals, Ninth Circuit.

Argued Jan. 15, 2003.

Resubmitted Sept. 15, 2004.

Filed Dec. 6, 2004.

Rick W. Jarvis, Meyers, Nave, Riback, Silver & Wilson, San Leandro, CA; Lee Rosenthal, Goldfarb & Lipman, Oakland, CA, for the defendants-appellants.

Stephanie E. Haffner, California Rural Legal Assistance, Stockton, CA; Deborah Collins, California Affordable Housing Law Project of the Public Interest Law Project, Oakland, CA, for the plaintiffs-appellees.

1. Defendants include the City of Stockton, Stockton City Council, Stockton Redevelopment Agency, Stockton Department of Hous-

Before: HUG, ALARCÓN, and GRABER, Circuit Judges.

PER CURIAM:

The City of Stockton and other defendants[1] (collectively the "City") appeal interlocutorily the district court's order granting a preliminary injunction in favor of Richard Price, other residents of low income hotels, and Metro Ministry, a nonprofit organization that helps the homeless in Stockton, California (collectively "Plaintiffs"). Plaintiffs brought an action alleging that the City violated its statutory duties under the Housing and Community Development Act, the Fair Housing Act, the Uniform Relocation Act, California's Redevelopment Act, and California's Relocation Assistance Act when the City began closing residential hotels and evicting the residents based on housing code violations.

The district court granted a preliminary injunction, finding that Plaintiffs had demonstrated a strong likelihood of success on the merits of their claim under the Housing and Community Development Act and that the balance of hardships tipped in their favor. The City appeals.

## I. Background

Plaintiffs are six former tenants of three substandard Single Resident Occupancy hotels ("SRO Hotels") in downtown Stockton, California, and one nonprofit organization that provides assistance to the City's homeless, Stockton Metro Ministry. The six former tenants were displaced from their homes when the SRO Hotels that

ing and Redevelopment, and various City officials and City Council members.

they lived in were closed by Stockton's Community Health Action Team ("CHAT").

CHAT is an interdepartmental code inspection team created by Stockton's City Manager in June 2001. CHAT's focus is on enforcing health, building, and safety regulations in the downtown area. The group is comprised of five city employees.

Since CHAT's formation approximately 32 multi-family residential buildings in downtown Stockton have been inspected. The inspections resulted in the closure of nine properties, six of which were vacated on an emergency basis. Some of the inspected SRO Hotels were closed after CHAT issued emergency notices for reasons such as bat infestation, fire and safety violations, and dangerous carbon monoxide emissions. Others were closed after the building owners failed to correct violations of which they had been previously notified.

After the SRO Hotels were closed due to the City's code enforcement activities, Plaintiffs filed an action against the City, seeking declaratory and injunctive relief. Plaintiffs also sought two writs of mandate, seeking relocation benefits and replacement housing.

Plaintiffs filed for a preliminary injunction on February 25, 2002. The district court granted the motion. In its order, the district court found that Plaintiffs had demonstrated a substantial likelihood of success in showing that federal Community Development Block Grant ("Block Grant") funds were used in the City's downtown code enforcement efforts and that relocation obligations were triggered under the Housing and Community Development Act, 42 U.S.C. § 5304(d) (hereafter "Section 104(d)"). Concluding that the balance of hardships tipped in Plaintiffs'

favor, the court enjoined the City from vacating, demolishing, or converting SRO Hotels in the downtown area until it adopted and implemented an antidisplacement and relocation assistance plan consistent with Section 104(d). The injunction also required the city to provide relocation assistance and replacement housing to all persons displaced by the City's ongoing emergency code enforcement activities as well as those previously displaced. The district court later modified its injunction to make clear that the City could vacate, but not convert, units or premises posing an immediate and grave danger to the health and safety of occupants or the public, to require that Plaintiffs' counsel be given twenty-four hours' notice of such evictions, and to order the parties to meet and confer over providing adequate notice to displaced persons of their right to relocation assistance.[2] The City appeals, challenging the scope of the injunction, the district court's factual findings regarding the City's use of federal funds, and the court's conclusion that code enforcement triggered City responsibilities under Section 104(d).

At oral argument, it became clear that the district court did not consider whether Section 104(d) creates either a private right of action or a right enforceable under 42 U.S.C. § 1983. The City did not raise this issue below or on appeal. Nonetheless, we requested supplemental briefing as to whether such a cause of action exists. Although this question is not one of jurisdiction, and therefore may be assumed without being decided, *Lapidus v. Hecht,* 232 F.3d 679, 681 n. 4 (9th Cir.2000), we shall consider it on the merits in light of the supplemental briefing provided by the parties.

---

**2.** Based on its Section 104(d) analysis, the district court determined that Plaintiffs also demonstrated a likelihood of success on their parallel state claims. Given these conclu-

sions, the district court did not find it necessary to address Plaintiffs' Fair Housing Act claims.

## II. Standard of Review

A district court's order granting a preliminary injunction is subject to limited review. *United States v. Peninsula Communications, Inc.*, 287 F.3d 832, 839 (9th Cir.2002). "The grant or denial of a preliminary injunction will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Id.* To obtain a preliminary injunction, Plaintiffs must show a likelihood of success on the merits and a possibility of irreparable injury, or that there are serious questions as to the merits and the balance of hardships tips in their favor. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir.2003). "We may affirm a district court's judgment on any ground supported by the record, whether or not the decision of the district court relied on the same grounds or reasoning we adopt." *Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir.2003).

## III. Discussion

### A. Whether Plaintiffs Have an Enforceable Right to Benefits Under Section 104 of the Housing and Community Development Act

The City contends, based on the four-part test announced in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), that no private right of action may be implied from Section 104(d). Plaintiffs correctly point out, however, that the provisions of Section 104(d) may create rights enforceable under 42 U.S.C. § 1983 (hereafter "Section 1983"). In evaluating either argument, our initial inquiry is the same: "whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002).[3] In *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), the Supreme Court set forth a three-factor test to guide this inquiry: (1) whether Congress intended the provision in question to benefit the plaintiff; (2) whether the plaintiff has demonstrated that the asserted right "is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) whether the provision giving rise to the right is "couched in mandatory, rather than precatory, terms." *Id.* at 340–41, 117 S.Ct. 1353.

The Court has since clarified the first part of this test, holding that it is only "unambiguously conferred right[s] . . ., not the broader or vaguer 'benefits' or 'interests,' that may be enforced" under Section 1983. *Gonzaga*, 536 U.S. at 283, 122 S.Ct. 2268.[4] Accordingly, we must examine the "text and structure of the statute" to determine whether it contains "the sort of

---

**3.** The main difference between an implied cause of action and a right enforceable under Section 1983 turns on the source of the remedy. A plaintiff invoking an implied right of action must demonstrate that Congress intended to create not only a private right but also a private remedy. *Alexander v. Sandoval*, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). In contrast, "[o]nce a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983," and the plaintiff need not show any further congressional intent to create a remedy. *Gonzaga*, 536 U.S. at 284, 122 S.Ct. 2268.

**4.** We have assumed that the *Blessing* test still applies to claims asserted under Section 1983. *See Save Our Valley v. Sound Transit*, 335 F.3d 932, 941, 943 (9th Cir.2003). Other courts examining the *Blessing* test in light of *Gonzaga* have concluded more explicitly that the test survives. *See, e.g., Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 186–87 (3d Cir.2004); *Rolland v. Romney*, 318 F.3d 42, 52 n. 9 (1st Cir.2003); *Sanchez v. Johnson*, 301 F.Supp.2d 1060, 1062 (N.D.Cal.2004).

'rights-creating' language critical to showing the requisite congressional intent to create new rights." *Id.* at 286, 287, 122 S.Ct. 2268 (quoting *Alexander,* 532 U.S. at 288–89, 121 S.Ct. 1511). Such language must confer an "individual entitlement," demonstrated by an " 'unmistakable focus on the benefited class' " rather than on the person or entity regulated. *Id.* at 287, 121 S.Ct. 1511 (quoting *Cannon v. Univ. of Chicago,* 441 U.S. 677, 691, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)). In other words, to create enforceable rights the language of the statute must focus on individual entitlement to benefits rather than the aggregate or systemwide policies and practices of a regulated entity. *See id.* at 287–88, 121 S.Ct. 1511; *see also Sabree ex rel. Sabree v. Richman,* 367 F.3d 180, 187–88 (3d Cir.2004).

No court appears to have considered whether the statutory provisions at issue here create either an implied right of action or rights enforceable under Section 1983. In *Walker v. City of Lakewood,* 272 F.3d 1114 (9th Cir.2001), we did not find it necessary to address the defendant's argument that the Housing and Community Development Act provides no private cause of action because the plaintiff's retaliation claims in that case could proceed under the Fair Housing Act. *See id.* at 1127. The City in its supplemental brief points to cases holding that the anti-discrimination provisions of the Housing and Community Development Act, 42 U.S.C. § 5309, do not create an implied private right of action. *See, e.g., Latinos Unidos De Chelsea En Accion v. Sec'y of Housing & Urban Dev.,* 799 F.2d 774, 793–94 (1st Cir.1986). These cases are not determinative here, however, because "we are to examine whether particular statutory provisions create specific enforceable rights, rather than considering the statute and purported rights on a more general level." *Legal Servs. of N. Cal., Inc. v. Arnett,* 114 F.3d 135, 138 (9th Cir.1997) (citing *Bless-*

*ing,* 520 U.S. at 342–43, 117 S.Ct. 1353). Accordingly, our inquiry must focus on the "text and structure" of Section 104.

### 1. Whether Sections 104(d) and (k) of the Housing and Community Development Act Establish Federal Rights

The Block Grant program, Section 106 of the Housing and Community Development Act, is designed to support community development. *See* 42 U.S.C. §§ 5301(c)(1)-(3), 5306. Section 104 of the Act imposes specific responsibilities upon grantees when their Block Grant-assisted development projects cause displacement. First and foremost, Section 104(k) mandates that "[e]ach grantee shall provide for reasonable benefits to any person involuntarily and permanently displaced as a result of the use of assistance received under this chapter to acquire or substantially rehabilitate property." 42 U.S.C. § 5304(k). Moreover, Section 104(d) requires any grantee receiving Block Grant funding to certify that "it is following a residential antidisplacement and relocation assistance plan." 42 U.S.C. § 5304(d)(1), (2). Section 104(d)(2)(A) sets forth four principal requirements for such plans. 42 U.S.C. § 5304(d)(2)(A)(i)-(iv).

Whether Section 104(d) was intended to create individual federal rights presents a difficult question. The structure of Section 104(d) primarily addresses the obligation of Block Grant recipients to certify that they are "following a residential antidisplacement and relocation assistance plan." 42 U.S.C. § 5304(d)(1). Under current Supreme Court precedent, the provisions of such plans do not always create enforceable rights, even when they arguably convey some intent to benefit individuals. *Compare Wilder v. Va. Hosp. Ass'n,* 496 U.S. 498, 512, 519 & n. 17, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (finding

that state plan provision under Medicaid legislation "actually required the states to adopt reasonable and adequate [reimbursement] rates" and "set forth in some detail the factors to be considered in determining the methods for calculating rates," thus creating rights enforceable under Section 1983), *with Suter v. Artist M.*, 503 U.S. 347, 351, 360, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) (holding that state plan provision of the Adoption Assistance and Child Welfare Act, requiring states to make "reasonable efforts" to "prevent or eliminate" the need for removing a child from his or her home prior to placing that child in foster care, created no enforceable right because the "reasonable efforts" requirement was intended to "vary with the circumstances of each individual case," and its satisfaction, "within broad limits," was left to the discretion of the states). In its most recent opinion in this area, the Court in *Gonzaga* affirmed the continuing vitality of both *Suter* and *Wilder*, relying on both cases in distilling the standard for evaluating whether rights are enforceable under Section 1983. *See Gonzaga*, 536 U.S. at 280–81, 122 S.Ct. 2268. The *Gonzaga* Court characterized the provision at issue in *Wilder* as enforceable because it "explicitly conferred" on health care providers a "specific monetary entitlement[ ]" to an "objective" amount of reimbursement. *Id.* at 280, 122 S.Ct. 2268.

We need not decide the difficult question whether the obligations set forth in Section 104(d)(2)(A) are insufficient to establish individual rights because they are presented as requirements of a plan on which federal funding is conditioned. We can avoid the question because Section 104(k) of the Act clearly mandates—quite aside from any plan or certification requirement—that "[e]ach grantee shall pro-

vide for reasonable benefits to any person involuntarily and permanently displaced as a result of the use of assistance received under this chapter to acquire or substantially rehabilitate property." 42 U.S.C. § 5304(k). This section is "phrased with an unmistakable focus on the benefited class." *Gonzaga*, 536 U.S. at 284, 122 S.Ct. 2268 (internal quotation marks omitted). Moreover, it does not speak "only in terms of institutional policy and practice," *id.* at 288, 122 S.Ct. 2268, but rather requires that benefits be provided to particular persons displaced by federally funded redevelopment activities. This language evinces a clear intent to create a federal right.

Read in isolation, the right to "reasonable benefits" created by Section 104(k) might seem too vague for judicial enforcement. *See Suter*, 503 U.S. at 359–61, 112 S.Ct. 1360. Unlike the statute at issue in *Suter*, however, under which "[n]o further statutory guidance is found as to how 'reasonable efforts' are to be measured," *id.* at 360, 112 S.Ct. 1360, the Housing and Community Development Act provides ample and specific guidance by way of Section 104(d) and its implementing regulations. Section 104(d) was added to the Housing and Community Development Act in 1988,[5] five years after Section 104(k), in response to Congress's concern that federally funded redevelopment activities were harming communities. As one House Report stated,

> It is particularly distressing to this Committee that a number of [Block Grant-funded] activities . . . have resulted in the dislocation of residents and businesses. It is not sufficient to bring productive life back to impoverished residential and commercial areas of a city if

**5.** Housing and Community Development Act of 1987, Pub.L. No. 100–242, 101 Stat. 1815, Tit. V, subtit. A, § 509(a)(2) ("Conserving Neighborhoods and Housing by Prohibiting Displacement").

the low and moderate income residents that have struggled for years to survive in spite of adverse circumstances are neglected or harmed during the process of revitalization.

H.R.Rep. No. 100–122, at 78 (1987), *reprinted* in 1987 U.S.C.C.A.N. 3317, 3394. In response to this concern, Congress required Block Grant recipients

> to certify they are following anti-displacement and relocation assistance plans that must be written and made available to the public and that generally prohibit the involuntary displacement of low and moderate income persons but where that displacement is unavoidable, requires [*sic*] the one-for-one replacement of demolished or converted housing and the provision of financial relocation assistance for residents who are themselves displaced.

*Id.* The final version of the Act preserved Congress's intent to provide specific kinds of assistance for low and moderate income residents directly displaced by federally-funded redevelopment activities. *See* 133 Cong. Rec. S18607–01 (Dec. 21, 1987) (statements of Sens. Cranston, D'Amato, Armstrong, Karnes, & Chafee). Far from showing any intent to alter or undermine the individual right granted by Section 104(k), this history demonstrates that Section 104(k) alone had proven insufficient to allay Congress's concern over the effects of displacement and that additional, particularized requirements were necessary.

Thus, Section 104(d) and its implementing regulations have a direct bearing upon the "reasonable benefits" to which displaced persons unquestionably are entitled

under Section 104(k).[6] In particular, Section 104(d)(2)(A)(iii) precisely enumerates the monetary benefits to which displaced persons of low and moderate income are entitled, "including reimbursement for actual and reasonable moving expenses, security deposits, credit checks, and other moving-related expenses, including any interim living costs." 42 U.S.C. § 5304(d)(2)(A)(iii); *see also* 24 C.F.R. § 42.350(a)-(d). Grantees also must provide either compensation sufficient to ensure that displaced families "shall not bear, after relocation, a ratio of shelter costs to income that exceeds 30 percent," 42 U.S.C. § 5304(d)(2)(A)(iii)(I), or an equivalent payment designed to permit the household to "secure participation in a housing cooperative or mutual housing association." 42 U.S.C. § 5304(d)(2)(A)(iii)(II); *see also* 24 C.F.R. § 42.350(e)(1), (2).

Section 104(d)(2)(A)(iv), in turn, entitles displaced persons to relocation into "comparable replacement housing" that satisfies qualitative standards relating to size, sanitation, and environmental health. 42 U.S.C. § 5304(d)(2)(A)(iv). Corresponding regulations dictate that grantees advise displaced persons that they cannot be required to move until at least one "comparable replacement dwelling" has been made available to them. 42 C.F.R. § 42.350(a) (defining the assistance available under section 104(d) as including advisory services "at the levels described in 49 CFR part 24"); 49 C.F.R. § 24.204 ("No person to be displaced shall be required to move from his or her dwelling unless at least one comparable replacement dwelling

---

**6.** It is now well settled that regulations *alone* cannot create rights enforceable through either an implied right of action or Section 1983. *Alexander v. Sandoval*, 532 U.S. 275, 291, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); *Save Our Valley v. Sound Transit*, 335 F.3d 932, 939 (9th Cir.2003). We continue to rec-

ognize, however, that regulations "may be relevant in determining the scope of the right conferred by Congress" and "therefore may be considered in applying the three-prong *Blessing* test." *Save Our Valley*, 335 F.3d at 943.

(defined at § 24.2) has been made available.").

These statutory provisions identify particular relocation assistance benefits that grantees "shall" provide to individuals displaced by federally funded acquisition or rehabilitation activities within the meaning of Section 104(k). Read together with Section 104(k), these provisions confirm Congress's intent not only to impose a plan certification requirement on grantees, but also to confer upon persons displaced by redevelopment activities an enforceable entitlement to the specific benefits of such plans. *Cf. Livadas v. Bradshaw,* 512 U.S. 107, 134, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (finding right to complete the collective-bargaining process under the National Labor Relations Act, although "not provided in so many words" in the statute, to be "immanent in its structure" and thus enforceable under Section 1983). The "text and structure" of these provisions of the Housing and Community Development Act therefore contain precisely "the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights." *Gonzaga,* 536 U.S. at 286, 287, 122 S.Ct. 2268.

However, other provisions of Section 104(d)(2)(A) do not share Section 104(k)'s focus on individual benefits. *See* 42 U.S.C. § 5304(d)(2)(A)(i), (ii). The obligations of Section 104(d)(2)(A)(i) and (ii) serve to ensure that the overall supply of affordable housing within the affected community remains constant. Section 104(d)(2)(A)(i) mandates one-for-one replacement of "occupied *and vacant occupiable* low and moderate income dwelling units"—that is, units that could have been, but were not, occupied by anyone. 42 U.S.C. § 5304(d)(2)(A)(i) (emphasis added). The replacement units "shall be designed to remain affordable" to persons of low and moderate income for 10 years. 42 U.S.C. § 5304(d)(2)(A)(ii). Yet unlike the provisions that require grantees to supply monetary benefits and comparable replacement housing to displaced individuals, the requirements of Section 104(d)(2)(A)(i) and (ii) are directed to "governmental agencies [and] private developers" and are phrased in aggregate terms, without reference to individual displaced persons. 42 U.S.C. § 5304(d)(2)(A)(i), (ii); *see also* 24 C.F.R. § 42.375.

This aggregate focus is further reflected in Congress's statement that the requirements of Section 104(d)(2)(A)(i) and (ii) "shall not apply in any case in which the Secretary finds, on the basis of objective data, that there is available in the area an adequate supply of habitable affordable housing for low and moderate income persons." 42 U.S.C. § 5304(d)(3). The Secretary's determination with respect to this aggregate supply of affordable housing is expressly made " *final and nonreviewable,*" 42 U.S.C. § 5304(d)(3) (emphasis added), whereas determinations regarding individual claims for assistance are subject to judicial review, *see* 42 U.S.C. § 5304(d)(2)(C). The distinct judicial review provisions are a strong indication that Congress intended for Section 104(d)(2)(A)(i) and (ii) to be treated differently from provisions providing for individual benefits.

■ In consideration of this aggregate focus, we hold that the requirements of Section 104(d)(2)(A)(i) and (ii) do not spell out the "reasonable benefits" to which displaced persons are entitled under Section 104(k). Nor, for that matter, do they create individual rights directly: whatever significance we give to the fact that Section 104(d)(2)(A) sets forth the requirements of a plan, rather than imposing a direct obligation, the lack of " 'rights-creating' language" and the absence of any focus on individual entitlements, *see Gonzaga,* 536 U.S. at 286–88, 122 S.Ct. 2268,

would prevent us from holding that Section 104(d)(2)(A)(i) and Section 104(d)(2)(A)(ii) create individual rights. *Cf. Blessing,* 520 U.S. at 343, 117 S.Ct. 1353 (holding that a statute did not give rise to individual rights where it required a federal agency to evaluate a state's *aggregate* provision of services, rather than to determine "whether the needs of any particular person have been satisfied").

In sum, we conclude that Plaintiffs have satisfied the three-part *Blessing* test with respect to Section 104(d)(2)(A)(iii) and (iv), but *not* with respect to Section 104(d)(2)(A)(i) and (ii). First, Section 104(k) unambiguously establishes an individual right to "reasonable benefits." Second, because Section 104(d)(2)(A)(iii) and (iv) spell out the content of this right in detailed and specific terms that are further clarified by implementing regulations, the rights asserted by Plaintiffs are not so vague and amorphous as to frustrate judicial enforcement. Finally, the terms of the relevant provisions are clearly mandatory rather than precatory or merely hortatory. Therefore, Plaintiffs have asserted a federal right presumptively enforceable under Section 1983. *See Gonzaga,* 536 U.S. at 284, 122 S.Ct. 2268.

## 2. Whether Congress Intended to Foreclose a Remedy Under Section 1983

■ The burden therefore falls on the City to "rebut this presumption by showing that Congress 'specifically foreclosed a remedy under § 1983.' " *Id.* at 284 n. 4, 122 S.Ct. 2268 (quoting *Smith v. Robinson,* 468 U.S. 992, 1004–05 & n. 9, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984)). The City may make this showing by demonstrating "that Congress shut the door to private enforcement either expressly, through 'specific evidence from the statute itself,' " *id.* (quoting *Wright,* 479 U.S. at 423, 107 S.Ct. 766), or "impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement

under § 1983." *Blessing,* 520 U.S. at 341, 117 S.Ct. 1353. "We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." *Wilder,* 496 U.S. at 520, 110 S.Ct. 2510 (quotation marks and citations omitted).

■ The City has not carried its burden. The Housing and Community Development Act does not expressly preclude suits under Section 1983, nor does it provide a comprehensive remedial scheme incompatible with private enforcement. Section 104(k), the source of the individual right here, contains no remedial language from which an intent to preclude enforcement could be implied. Moreover, assuming that the potential remedies as well as the "reasonable benefits" of Section 104(d) are incorporated into Section 104(k), we find no intent to preclude Section 1983 enforcement. Although Section 104(d)(2)(C) provides that a claimant denied relocation into comparable replacement housing pursuant to Section 104(d)(2)(A)(iv) "may appeal" to the Secretary or an appropriate state official, this avenue of relief does not provide a comprehensive remedial scheme incompatible with Section 1983 enforcement. First, it is not phrased in mandatory or exclusive terms; if Congress had intended to preclude any other means of enforcement, it could have made clear that an aggrieved claimant *must* appeal to the Secretary. Second, this provision on its face applies only to the comparable housing requirements of Section 104(d)(2)(A)(iv). The City argues that this appeal process has been extended by regulation to encompass denials of all types of assistance required by Section 104(d). *See* 24 C.F.R. § 42.390. The question here, however, is whether *Congress* intended to preclude a remedy. Just as regulations cannot create a right in the absence of Congressional intent, *see Alex-*

*ander,* 532 U.S. at 291, 121 S.Ct. 1511, regulations cannot deny by implication a remedy that Congress did not intend to foreclose. Moreover, the mere existence of administrative mechanisms to safeguard individual interests does not demonstrate congressional intent to "close the door" on Section 1983 enforcement. *See Blessing,* 520 U.S. at 347–48, 117 S.Ct. 1353; *see also Abrams v. City of Rancho Palos Verdes,* 354 F.3d 1094, 1096–97 (9th Cir.), *cert. granted,* —— U.S. ——, 125 S.Ct. 26, 159 L.Ed.2d 856 (2004). Consequently, Section 104(d)(2)(C) does not establish a comprehensive remedial scheme addressing all "reasonable benefits" required under Section 104(k).

The City also points to Section 111 of the Housing and Community Development Act, which allows the Secretary either to terminate funding upon finding that a grantee has failed to comply with applicable requirements or to refer such matters to the Attorney General for civil prosecution. 42 16540 U.S.C. § 5311(a), (b). This section also provides grantees with the right to petition for review of the Secretary's decision. 42 U.S.C. § 5311(c). The City argues that the First Circuit in *Latinos Unidos* found a similar remedial scheme in the Act's anti-discrimination provisions, 42 U.S.C. § 5309(b), sufficiently comprehensive to preclude private enforcement. Although the City is correct that the two sections resemble one another, its reliance on *Latinos Unidos* is unavailing. In that case, the First Circuit concluded that no private anti-discrimination remedy could arise under the Act largely because "Congress expected that Titles VI and VIII [of the Civil Rights Act] would provide the primary obligations with regard to nondiscrimination," and that "denying a private right of action under [the Act] does little to limit an individual's ability to challenge discriminatory practices." *Latinos Unidos,* 799 F.2d at 794. The "main purpose" of the anti-discrimination remedial scheme in the Housing and Community Development Act "was the practical one" of defining the Secretary's role in ensuring that grantees did not discriminate. *Id.* Here, however, there is no alternative civil remedy available to individuals displaced by Block Grant-funded activities, and Section 111 does not provide any avenue for redress. *See Chan v. City of New York,* 1 F.3d 96, 105 (2d Cir.1993) (holding provisions of Section 111 insufficiently comprehensive to preclude Section 1983 enforcement of prevailing wage rights conferred by Section 110, 42 U.S.C. § 5310).

The City also relies on *Suter,* in which the Supreme Court observed that a similar administrative scheme provided an enforcement mechanism for the plaintiffs' asserted rights under the Adoption Act. *See Suter,* 503 U.S. at 360–61, 112 S.Ct. 1360. The Court explicitly declined to consider, however, whether this scheme would be sufficiently comprehensive to preclude Section 1983 enforcement, and even noted that it might not be. *Id.* at 360 & n. 11, 112 S.Ct. 1360. As such, *Suter* is not controlling here. There is nothing in Section 111 that would provide Plaintiffs with a comprehensive remedy, and also nothing that would be incompatible with private enforcement under Section 1983.

Because the City has not met its burden of proving that either Section 104(d) or Section 104(k) provides a comprehensive remedial scheme inconsistent with Section 1983 enforcement, we conclude that Plaintiffs have a cause of action under Section 1983.

## B. The Preliminary Injunction

### 1. Likelihood of success on the merits

The district court concluded that Plaintiffs had a strong likelihood of success on the merits of their Section 104(d) claim. The court's factual findings, however, dem-

onstrate that success on the merits is at least as likely under Section 104(k).

On its face, Section 104(k) requires provision of "reasonable benefits" only where displacement occurs "as a result of" the use of Block Grant funds "to acquire or substantially rehabilitate property." 42 U.S.C. § 5304(k). The district court found that the City had used Block Grant funding not for direct acquisition or rehabilitation of Plaintiffs' residences, but rather for code enforcement that led to Plaintiffs' involuntary and permanent displacement. The court also found, however, that the City's "redevelopment activities, which included code enforcement, notices of vacating and demolition, and the acquisition of hotels through purchase and eminent domain proceedings, amounted to a 'single undertaking.' " Dist. Ct. Order at 21. Indeed, "the circumstances strongly suggest[ed]" that "the City's goals to redevelop downtown through acquisition of buildings in the area … precipitated code enforcement." *Id.* at 23–24. Accordingly, the court concluded that Plaintiffs' displacement occurred "in connection with" downtown redevelopment activities. None of these findings are clearly erroneous; indeed, all are amply supported by evidence in the record.

The district court's factual findings therefore support a determination that Plaintiffs are likely to succeed under Section 104(k). As noted, the code enforcement activities were "precipitated" by the City's redevelopment goals. The City instituted its "zero tolerance" code enforcement policy against downtown residential hotels two days after drawing up its acquisition list. The hotels targeted for code enforcement using Block Grant funds all were on the City's list. After closing several of these hotels for code violations, the City moved to acquire two of them through eminent domain proceedings. Under these particular circumstances, the City clearly made use of Block Grant funds as part of its overall effort to "acquire or substantially rehabilitate" downtown hotels. Plaintiffs were displaced "as a result of" this effort. It would elevate form over substance to allow the City to escape its replacement housing and relocation assistance obligations merely by channeling Block Grant funds into code enforcement rather than direct acquisition or rehabilitation, where the code enforcement itself was an integral first step in the City's overarching plan to acquire the downtown hotels. We also agree with the district court that such "budgetary sleight of hand" would frustrate the intent of Congress in enacting Section 104(d), which was specifically intended to assist residents directly displaced by redevelopment activities. *See* Dist. Ct. Order at 21 n. 11. Insofar as Section 104(d) spells out in detail the "reasonable benefits" required under Section 104(k) for low and moderate income displacees, we must conclude that Plaintiffs have a strong likelihood of success on the merits of this claim. We therefore affirm the district court's conclusion as to this prong of the preliminary injunction standard, despite the slightly different legal grounds relied upon below. *See Atel Fin. Corp. v. Quaker Coal Co.,* 321 F.3d 924, 926 (9th Cir.2003).

## 2. Balance of Hardships

In deciding whether to issue a preliminary injunction, the district court will not only consider the plaintiffs' likelihood of success on the merits, but also the "balance of hardships." *See Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1528 (9th Cir.1993). The City argues that the balance of hardships tips in its favor. However, we conclude that the district court did not abuse its discretion in concluding otherwise.

Despite the hardships the City may face in delaying some of its development plans and providing relocation benefits, we agree with the district court that it is a far more severe hardship for someone to be displaced from his or her home without assistance and without the certainty of knowing where to move. Displaced residents were forced to relocate either to other hotels or to a migrant farm labor camp run by the San Joaquin Housing Authority. That camp, however, was closed in February 2002, and the City was proceeding with additional hotel closures at the time the injunction issued, increasing the uncertainty and hardship for displaced residents and the potential burden on Stockton Metro Ministry. Hence, we cannot conclude the district court erred in finding that the Plaintiffs' hardship outweighed any which the City may suffer as a result of the preliminary injunction.

### 3. The Scope of the Injunction

We confront two issues related to the scope of the injunction. First, we must decide whether Section 104(k) supports all aspects of the injunction. Second, we must evaluate whether the injunction sweeps too broadly in potentially benefitting persons not before the court.

■ As we have discussed, Section 104(k) gives displaced persons an individual entitlement to "reasonable benefits," as elucidated in Section 104(d)(2)(A)(iii) and (iv) and corresponding regulations. To the extent that the district court's order directs the City to provide the benefits described in Section 104(d)(2)(A)(iii) and (iv) to individuals before displacing them, the order is consistent with our treatment of Section 104(k) as the source of individual rights. However, because we hold that the replacement housing provisions of Section 104(d)(2)(A)(i) and (ii) do not create enforceable individual rights, we must reverse the district court's injunction insofar

as it requires the City to adopt and implement a "replacement housing plan"—that is, to provide one-for-one replacement of dwelling units—before vacating, demolishing, or converting residential hotels and motels in the downtown Stockton area. The preliminary injunction must be narrowed to protect only those individual rights that Plaintiffs are permitted to enforce in this action: the right to "reasonable benefits" conferred by Section 104(k) and elucidated in Section 104(d)(2)(A)(iii) and (iv).

■ Finally, we do not believe that the district court abused its discretion by requiring the City to provide benefits to all entitled displacees. "A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir.1983). A preliminary injunction should be used only to maintain the status quo. Therefore, an injunction must be narrowly tailored "to affect only those persons over which it has power," *id.*, and to remedy only the specific harms shown by the plaintiffs, rather than "to enjoin all possible breaches of the law." *Id.* at 728 n. 1 (citation omitted). Even though the effect of the injunction may benefit more people than those that are party to the action, the City must meet its obligations under Sections 104(d) and 104(k) in order to remedy the harms shown by Plaintiffs, who include not only the individual named displacees but also Stockton Metro Ministry, whose ability to serve a broader population of low-income and homeless people has been hampered by the City's activities. *See Zepeda*, 753 F.2d at 728 n. 1 ("[A]n injunction benefiting nonparties is permissible if such breadth is necessary to give prevailing parties the relief to which they are enti-

tled.") (internal quotation marks and citation omitted). Because the breadth of the injunction was necessary to preserve the status quo for all Plaintiffs, the district court did not abuse its discretion by ordering that relocation assistance benefits be provided to all displaced persons. We therefore affirm the injunction in part.

## C. California Relocation Assistance Act

The City argues that the district court erred by not separately analyzing the California Relocation Assistance Act. The preliminary injunction, however, by its terms was based solely on Plaintiffs' likelihood of success on their Housing and Community Development Act claim. Because we hold that the preliminary injunction may be affirmed in the particulars related to relocation assistance, on this federal claim, we need not address at this stage whether the district court erred by declining to analyze the state claims in detail.

## III. Conclusion

Although the district court analyzed and issued its injunction in terms of a cause of action under Section 104(d), we hold that its factual findings support a conclusion that Plaintiffs are likely to succeed on the merits under Section 104(k), at least with respect to individual relocation assistance benefits, and agree that the balance of hardships tips sharply in Plaintiffs' favor. Therefore, the district court's preliminary injunction is AFFIRMED, in part, and REVERSED, in part, and the case is REMANDED to the district court for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.