**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEPHEN SANCHEZ, by and through
his mother and next friend, Joyce
Hoebel; KORY NIGIAN, by and
through his mother and next
friend, Irene Ybarra; KATHY
TOBIASON, by and through her
mother and next friend, Sandra
Nash; SCOTT DE SANTO; GRACE
EWALT, a minor, by and through
her mother, Suzanne Ewalt; SCOTT
CROSE, by and through his mother
and conservator, Janice Crose;
EDWARD EDDIE COMPTON, by and
through his parents and next
friends, Edward and Elaine
Compton; AUTISM SOCIETY OF LOS
ANGELES; CALIFORNIA
REHABILITATION ASSOCIATION;
CALIFORNIA COALITION OF UNITED
CEREBRAL PALSY ASSOCIATIONS;
EASTER SEALS CALIFORNIA; SYSTEMS
REFORM, INC.; TIERRA DEL SOL,
INC.,

> No. 04-15228
> D.C. No.
> CV-00-01593-CW
> OPINION

         *Plaintiffs-Appellants,*

v.

GRANTLAND JOHNSON, in his official
capacity as Secretary of the
California Department of Health
and Human Services; CLIFFORD
ALLENBY, in his official capacity
as Director of the California
Department of Developmental
Services; DIANE M. BONTA, in her
official capacity as Director of the
California Department of Health
Services; B. TIMOHTY GAGE, in his
official capacity as Director of the
California Department of Finance,
                        *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
December 8, 2004—San Francisco, California

Filed August 2, 2005

Before: Diarmuid F. O'Scannlain, Robert E. Cowen,* and
Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain

*The Honorable Robert E. Cowen, Senior United States Circuit Judge
for the Third Circuit, sitting by designation.

## COUNSEL

Thomas K. Gilhool, The Public Interest Law Center of Phila-
delphia, Philadelphia, Pennsylvania, argued the cause for the
appellants. Michael Churchill, Judith A. Gran, and James
Eiseman, Jr., of The Public Interest Law Center of Philadel-
phia, and Arlene Mayerson and Larisa M. Cummings, of the
Disability Rights Education & Defense Fund, Berkeley, Cali-
fornia, were on the briefs.

Susan M. Carson, Deputy Attorney General, State of Califor-
nia, argued the cause for the appellee. Bill Lockyer, Attorney
General, Teresa Stinson, Supervising Deputy Attorney Gen-
eral, and Elizabeth Edwards, Deputy Attorney General, State
of California, and Henry S. Hewitt, Todd Boley, and Clarisa
R. Canady, of Erickson, Beasley, Hewitt & Wilson LLP, Oak-
land, California, were on the briefs.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether developmentally disabled recipi-
ents of Medicaid funds and their service providers have a pri-
vate right of action against state officials to compel the
enforcement of a federal law governing state disbursement of
such funds. We are also asked to decide, separately, whether
the State of California has unlawfully discriminated by alleg-
edly paying community-based service providers lower wages
and benefits than it pays employees in state institutions.

I

In May, 2000, seven named plaintiffs representing a class
of developmentally disabled individuals, and six organiza-

tions that advocate for, or provide community-based services to, the developmentally disabled, brought this action against California officials who manage and administer various state programs for the developmentally disabled.

The class (collectively referred to by reference to the first named plaintiff as "Sanchez") consists of those individuals who would be capable of living in the community with properly funded support services but who now live in, or are at risk of living in, state institutions because community-based services are inadequately funded. All members of the class are entitled to services under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (the "Medicaid Act"), and are "qualified individual[s] with a disability" under § 504 of the Rehabilitation Act ("§ 504"), 29 U.S.C. § 794(a), and under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134 (the "ADA").

The organizational plaintiffs (the "Providers") are not part of the class, but receive reimbursement from the State of California under the Medicaid Act for providing services to the developmentally disabled.

The state officials are, respectively, officials of California's Department of Health and Human Services, Department of Health Services, Department of Developmental Services ("DDS") and Department of Finance. These departments administer and oversee services funded, in part, through the Medicaid Act. Generally, the Department of Health and Human Services ensures that the services of the other departments are provided in compliance with state and federal law; the Department of Health Services directs, organizes and administers California's medical assistance programs, including Medi-Cal, California's Medicaid program; DDS directs, organizes and administers California's developmental disabilities services program; and the Department of Finance oversees all of the State's financial and business policies, including health care funding.

A

Under the Medicaid Act, the federal government distributes funds to participating states to help them provide health care services for the poor and needy. Because California accepts Medicaid funds, it must administer its state Medicaid program, Medi-Cal, in compliance with a state plan that has been pre-approved by the U.S. Department of Health and Human Services. The Medicaid Act sets out the requirements for a state plan at 42 U.S.C. § 1396a(a)(1)-(65).

In 1981, in response to the fact that a disproportionate percentage of Medicaid resources were being used for long-term institutional care and studies showing that many persons residing in Medicaid-funded institutions would be capable of living at home or in the community if additional support services were available, Congress authorized the Home and Community Based Services ("HCBS") waiver program. The HCBS program allows a variety of noninstitutional care options for persons who would otherwise be eligible for Medicaid benefits in an institution, but who would prefer to live at home or in the community.[1] To obtain a HCBS waiver for a qualified person, the State must certify that the cost of placing that individual through the waiver program will be less than or equal to the cost of his care in an institution. *See generally Olmstead v. L.C.*, 527 U.S. 581, 601-02 (1999).

---

[1]The program was established under 42 U.S.C. § 1396n(c)(1), which provides, in part, that:

> The Secretary may by waiver provide that a State plan approved under this title [42 USCS §§ 1396 *et seq.*] may include as "medical assistance" under such plan payment for part or all of the cost of home or community-based services (other than room and board) approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or a nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan.

B

Sanchez and the Providers claim that, because California pays wages to community-based service providers participating in the HCBS waiver program at a lower rate than it pays employees in state institutions, the State is in violation of the provision of the Medicaid Act that requires that

> A State plan for medical assistance — [must] provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to . . . assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area[.]

42 U.S.C. § 1396a(a)(30)(A) ("§ 30(A)"). They further claim that the lower pay in community-based programs has resulted in some developmentally disabled persons remaining unnecessarily institutionalized, which, they allege, constitutes discrimination against them in violation of the ADA and § 504. Sanchez and the Providers seek injunctive relief requiring the state officials to increase wages and benefits for community-based service providers to match substantially the wages and benefits of employees in state institutions.

C

The state officials moved for judgment on the pleadings with respect to the § 30(A) claim, on the ground that § 30(A) does not provide a private right of action enforceable under 42 U.S.C. § 1983 ("§ 1983"), and for summary judgment with respect to the ADA and § 504 claims, on the ground that Sanchez and the Providers failed to establish sufficient facts establish a prima facie case for discrimination.

The district court initially granted the state officials' summary judgment motion, but denied the motion for judgment on the pleadings with respect to the § 30(A) claim. The state officials subsequently filed a motion for reconsideration of the § 30(A) claim in light of the Supreme Court's intervening decision in *Gonzaga v. Doe*, 536 U.S. 273 (2002), which clarified the standard for evaluating whether a statute creates a private right of action.[2] The district court granted the motion and, by opinion and order dated January 5, 2004, reversed its earlier decision. Applying the Supreme Court's guidance in *Gonzaga*, the district court concluded that neither Sanchez nor the Providers could bring suit under § 1983 for a violation of § 30(A).

Sanchez and the Providers timely appeal from the district court's adverse decisions with respect to both their § 30(A) and their ADA and § 504 claims.

II

Both Sanchez and the Providers claim that § 30(A) creates an individual right enforceable by them under § 1983. Their interests, however, though similar, are not congruent. Sanchez's claim requires us to decide whether § 30(A) creates a private right of action for recipients of Medicaid funding; the Providers' claim requires us to decide the same question with respect to providers of Medicaid services. Both claims require us to consider the current state of the Supreme Court's private right of action and § 1983 jurisprudence.

---

[2]*Gonzaga* involved an alleged violation of the Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g, which prohibits "the federal funding of educational institutions that have a policy or practice of releasing education records to unauthorized persons." 536 U.S. at 276. Gonzaga University disclosed a student's alleged sexual misconduct to the state agency responsible for teacher certification, whereupon the student sued to enforce the privacy provisions of FERPA. The Court held that "such an action [was] foreclosed because the relevant provisions of FERPA create no personal rights to enforce under 42 U.S.C. § 1983." *Id.*

A

In *Maine v. Thiboutot*, 448 U.S. 1 (1980), the Supreme Court held for the first time that § 1983 permits suits against state officials to enforce statutes enacted pursuant to Congress's spending power. *Id.* at 4-5. The scope of these new remedies available under § 1983 was clarified in *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981), in which the Court explained that *Thiboutot* did not alter the fact that "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Id.* at 28. *Pennhurst* established that the remedy announced in *Thiboutot* was to be applied sparingly and only to statutes in which Congress "speak[s] with a clear voice," and "unambiguously" creates a "right[ ] secured by the laws of the United States." *Id.* at 17, 28 (quotation marks omitted). The Court also advised that the identification of a substantive right embodied in a statute was only the first of at least two steps that must be considered when analyzing whether that right is enforceable under § 1983. *Id.* at 28 n.21 ("Because we conclude that § 6010 confers no substantive rights, we need not reach the question whether there is a private cause of action under that section *or under 42 U.S.C. § 1983 to enforce those rights*.") (emphasis added).

Ten years later, in *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990), the Court held that 42 U.S.C. § 1396a(a)(13)(A) (subsequently repealed) of the Medicaid Act could give rise to a private right of action under § 1983. *Id.* at 523. This anomalous decision appeared to mark a sudden expansion in the Court's § 1983 jurisprudence. In hindsight, however, it was merely a rare case in which, as the Court explained in *Gonzaga*, a statute "explicitly conferred specific monetary entitlements upon the plaintiffs . . . [and]

Congress left no doubt of its intent for private enforcement
. . . ." *Gonzaga*, 536 U.S. at 280.**³**

**[1]** In *Blessing v. Freestone*, 520 U.S. 329 (1997), the
Court finally provided an analytical framework for courts to
use when evaluating whether or not a statute creates a right
enforceable under § 1983. *Blessing* requires a court to con-
sider three factors: (1) "Congress must have intended that the
provision in question benefit the plaintiff," *id*. at 340-41; (2)
"the plaintiff must demonstrate that the right assertedly pro-
tected by the statute is not so 'vague and amorphous' that its
enforcement would strain judicial competence," *id*. at 340;
and (3) "the statute must ambiguously impose a binding obli-
gation on the states. In other words, the provision giving rise
to the asserted right must be couched in mandatory rather than
precatory terms." *Id*. at 341. Somewhat confusingly, the first
*Blessing* factor addressed whether or not the plaintiff receives
an intended "benefit" from the statute, whereas the second
factor referred not to a "benefit" but to a "right." In *Gonzaga*,
the Court resolved this inconsistency.

**[2]** The Court first acknowledged that "[s]ome language in
our opinions might be read to suggest that something less than
an unambiguously conferred right is enforceable by § 1983."
*Gonzaga*, 536 U.S. at 282 (referring specifically to the *Bless-
ing* test). Correcting this misperception, the Court announced
that

> [w]e now reject the notion that our cases permit any-
> thing short of an unambiguously conferred right to

---

**³**Justice Stevens, writing in dissent in *Gonzaga*, even suggested that the
reasoning in *Wilder* is so out of step with the Court's holding in *Gonzaga*
that it has been effectively overruled. *Id*. at 300 n.8 (Stevens, J., dissent-
ing) ("[Imposing the implied right of action framework upon the § 1983
inquiry] *sub silentio* overrules cases such as *Wright* and *Wilder*. In those
cases we concluded that the statutes at issue created rights enforceable
under § 1983, but the statutes did not 'clearly and unambiguously,' . . .
intend *enforceability under § 1983*.")

support a cause of action brought under § 1983. Section 1983 provides a remedy only for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Accordingly, it is *rights*, not the broader or vaguer "benefits" or "interests," that may be enforced under the authority of that section. This being so, we further reject the notion that our implied right of action cases are separate and distinct from our § 1983 cases. To the contrary, our implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983.

*Id.* at 283. The Court repeatedly stressed that it is Congress's use of explicit, individually focused, rights-creating language that reveals congressional intent to create an individually enforceable right in a spending statute.[4] *See Gonzaga*, 536

---

[4]The Medicaid Act was promulgated under Congress's spending power, *see Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 682-83 (2003) (Thomas, J., concurring), which is encompassed in Art. I, § 8, cl. 1, of the United States Constitution. One of the few enumerated grants of federal legislative authority, *see Marbury v. Madison*, 5 U.S. 137, 176 1 Cranch 137, 176, 2 L. Ed. 60 (1803) (Marshall, C. J.) ("The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written."), the Spending Clause states that "Congress shall have Power To . . . provide for the . . . general Welfare of the United States." In *Pennhurst*, the Court advised that, when reviewing legislation enacted pursuant to the spending power, courts should be especially reluctant to conclude that Congress intended to create a new individual right enforceable against the States. Because of the quasi-contractual nature of Congress's spending power, states accepting funds from the federal government must be aware of the conditions attached to the receipt of those funds so that they can be said to have "voluntarily and knowingly accept[ed] the terms of the 'contract.' " 451 U.S. at 17. (citing *Steward Machine Co. v. Davis*, 301 U.S. 548, 585-598 (1937); *Harris v. McRae*, 448 U.S. 297 (1980)). "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. . . . [and] speak with a clear voice [in order to] enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.*

U.S. at 283-84 ("[T]he question whether Congress intended to create a private right of action is definitively answered in the negative where a statute *by its terms* grants no private rights to any identifiable class.") (quotation marks and alterations omitted, emphasis added).[5]

**[3]** As examples of paradigmatic rights-creating language, the Court cited the texts of Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972. *Id.* at 287 (comparing the text of FERPA unfavorably to "the individually focused terminology of Titles VI and IX"). Those

---

[5]Relying on an opaque item of legislative history, Sanchez and the Providers argue that the district court erred by focusing unduly on the explicit text of the statute to the exclusion of legislative intent. They allege that classic "rights-creating" language could not be used in § 30(A), since the section is included as part of the state plan requirements and that, in 1994, Congress amended the Medicaid Act to provide that

> [i]n an action brought to enforce a provision of the Social Security Act [42 U.S.C. §§ 301 *et seq*.], such provision is not to be deemed unenforceable because of its inclusion in a section of the Act requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M*., 112 S. Ct. 1360 (1992) but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in *Suter v. Artist M*. that section 471(a)(15) of the Act [42 U.S.C. § 671(a)(15)] is not enforceable in a private right of action.

42 U.S.C. § 1320a-2; *accord* 42 U.S.C. § 1320a-10. Although this text is hardly a model of clarity, the caveat that it "is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements" shows that, at the very least, it does not disturb the Supreme Court's reasoning in *Pennhurst*, which was decided prior to *Suter*. And as we are bound to follow the Court's holdings in *Blessing* and *Gonzaga*, which followed the enactment of 42 U.S.C. § 1320a-2, this provision does not disturb the general framework that we —and the district court in this case—have used to analyze private rights of action under § 1983.

statutes provide, respectively, that "No person in the United States shall . . . be subjected to discrimination," 42 U.S.C. § 2000d, and that "No person in the United States shall, on the basis of sex . . . be subjected to discrimination." 20 U.S.C. § 1681(a). Although our inquiry should not be limited to looking for those precise phrases, statutory language less direct than the individually-focused "No person shall . . ." must be supported by other indicia so unambiguous that we are left without any doubt that Congress intended to create an individual, enforceable right remediable under § 1983.

## B

Since *Gonzaga*, no federal court of appeals of which we are aware has concluded that § 30(A) provides Medicaid recipients or providers with a right enforceable under § 1983.

Before *Gonzaga*, the Fifth and Eighth Circuits each held that Medicaid recipients had such a private right of action. *See Evergreen Presbyterian Ministries, Inc. v. Hood*, 235 F.3d 908, 927-28 (5th Cir. 2000); *Ark. Med. Soc'y, Inc. v. Reynolds* 6 F.3d 519, 528 (8th Cir. 1993); *cf. Pa. Pharmacists Ass'n v. Houstoun*, 283 F.3d 531, 543-44 (3rd Cir. 2002) (en banc) (positing, in dicta, a right for recipients while rejecting such a right for providers); *Visiting Nurse Ass'n v. Bullen*, 93 F.3d 997, 1004 n.7 (1st Cir. 1996) (positing, in dicta, a right for recipients while holding that such a right existed for providers). The First, Seventh and Eighth Circuits held that such a right existed for Medicaid providers. *See Visiting Nurse Ass'n*, 93 F.3d at 1005 (1st Cir. 1996); *Methodist Hosps. v. Sullivan*, 91 F.3d 1026, 1029 (7th Cir. 1996); *Ark. Med. Soc'y, Inc.*, 6 F.3d at 528. By contrast, the Third and Fifth Circuits explicitly held that § 30(A) did not create a right enforceable by Medicaid providers. *See Pa. Pharmacists Ass'n*, 283 F.3d at 543; *Evergreen Presbyterian Ministries, Inc.*, 235 F.3d at 929.

However, in light of *Gonzaga*, the First Circuit has since reversed itself in a case involving only the rights of providers.

*See Long Term Care Pharm. Alliance v. Ferguson*, 362 F.3d 50, 59 (1st Cir. 2004) ("If *Gonzaga* had existed prior to *Bullen*, the panel could not have come to the same result. . . . Providers such as pharmacies do not have a private right of action under subsection (30)(A)."). With the First Circuit's example in mind, we turn to the language of § 30(A) to determine if it unambiguously manifests Congressional intent to create individual rights, whether for Medicaid recipients or providers, remediable under § 1983.

C

In contrast to the language of Title VI and Title IX, there is nothing in the text of § 30(A) that unmistakably focuses on recipients or providers as individuals. Moreover, the flexible, administrative standards embodied in the statute do not reflect a Congressional intent to provide a private remedy for their violation.

1

**[4]** In *Gonzaga*, the Supreme Court instructed that, when a "provision focuse[s] on 'the aggregate services provided by the State,' rather than 'the needs of any particular person,' it confer[s] no individual rights and thus [cannot] be enforced by § 1983." *Id.* at 282 (quoting *Blessing*, 520 U.S. at 340). Like the statute under review in *Gonzaga*, § 30(A) also has an aggregate focus, rather than an individual focus that would be evidence of an intent to confer an individually enforceable right. The statute speaks not of any individual's right but of the State's obligation to develop "methods and procedures" for providing services generally. Indeed, the only reference in § 30(A) to recipients of Medicaid services is in the aggregate, as members of "the general population in the geographic area." A statutory provision that refers to the individual only in the context of describing the necessity of developing statewide policies and procedures does not reflect a clear Congressional intent to create a private right of action.

The text does at least refer explicitly to Medicaid providers, but as a means to an administrative end rather than as individual beneficiaries of the statute. The State is directed to "provide methods and procedures . . . sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." Under § 30(A), providers are to be "enlisted" as subordinate partners in the administration of Medicaid services. They may certainly benefit from their relationship with the State, but they are, at best, indirect beneficiaries and it would strain common sense to read § 30(A) as creating a "right" enforceable by them. *See Gonzaga*, 536 U.S. at 284 ("For a statute to create such private rights, its text must be phrased in terms of the persons benefitted.").

2

Far from focusing on the rights of a specific class of beneficiaries, § 30(A) is concerned with a number of competing interests. It requires a State to "provide such methods and procedures relating to . . . care and services . . . as may be necessary to . . . assure that payments are consistent with efficiency, economy, and quality of care." The most efficient and economical system of providing care may be one that benefits taxpayers to the detriment of medical providers and recipients; likewise, the provision of "quality" care—whatever standard may be implied by such a nebulous term—is likely to conflict with the goals of efficiency and economy. The tension between these statutory objectives supports the conclusion that § 30(A) is concerned with overall methodology rather than conferring individually enforceable rights on individual Medicaid recipients.

In *Gonzaga*, Justice Breyer observed that the "broad and nonspecific" language of FERPA indicated that "Congress may well have wanted . . . to achieve the expertise, uniformity, wide-spread consultation, and resulting administrative

guidance that can accompany agency decisionmaking and to avoid the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action for damages." 536 U.S. at 292 (Breyer, J., concurring in the judgment). The language of § 30(A) is similarly ill-suited to judicial remedy; the interpretation and balancing of the statute's indeterminate and competing goals would involve making policy decisions for which this court has little expertise and even less authority.

3

**[5]** The text and structure of § 30(A) simply do not focus on an individual recipient's or provider's right to benefits, nor is the "broad and diffuse" language of the statute amenable to judicial remedy. We conclude, therefore, that Congress has not spoken with an unambiguous, clear voice that would put a State on notice that Medicaid recipients or providers are able to compel state action under § 1983.

D

This conclusion follows our discussion of the impact of *Gonzaga* in *Price v. City of Stockton*, 390 F.3d 1105 (9th Cir. 2004). In that case, former tenants of low-income hotels and a nonprofit organization involved in assisting the homeless sued the City of Stockton, alleging that the closing of residential hotels for health and safety reasons violated federal and state laws, including the Housing and Community Development Act. We were asked to decide whether the plaintiffs had a private right of action to enforce the relevant provisions of the act.

We began by observing that, after *Gonzaga*, "to create enforceable rights [such as would satisfy the first prong of the *Blessing* test] the language of the statute must focus on individual entitlement to benefits rather than the aggregate or systemwide policies and practices of a regulated entity." *Price*,

390 F.3d at 1110. Applying this rule, we noted that "[f]irst and foremost, Section 104(k) mandates that 'each grantee shall provide for reasonable benefits to *any person* involuntarily and permanently displaced as a result of the use of assistance received under this chapter to acquire or substantially rehabilitate property.' " *Id.* (emphasis added). From this language, we concluded that the section "is 'phrased with an unmistakable focus on the benefited class' [and] does not speak 'only in terms of institutional policy and practice,' . . . but rather requires that benefits be provided to particular persons displaced by federally funded redevelopment activities," and, therefore, it "evinces a clear intent to create a federal right." *Id.* at 1111 (quoting *Gonzaga*, 536 U.S. at 288) (citations omitted).

We also held that the " 'reasonable benefits' to which displaced persons unquestionably are entitled under Section 104(k)," were not "too vague for judicial enforcement." *Id*. Because related statutory provisions and regulations "enumerate[d] the monetary benefits to which displaced persons of low and moderate income are entitled, 'including reimbursement for actual and reasonable moving expenses, security deposits, credit checks, and other moving-related expenses, including any interim living costs,' " *id.* at 1112, we concluded that the terms of the statute anticipated a clear, enforceable remedy for violations of the rights enumerated in the statute. *Id*. at 1112, 1114.

In contrast, we held that "other provisions of [the statute under consideration] do not share Section 104(k)'s focus on individual benefits," *id*. at 1113, and, instead, "are *directed to governmental agencies* . . . and are phrased in aggregate terms, without reference to individual displaced persons." *Id*. (emphasis added, quotation marks omitted). We concluded that, "[i]n consideration of this aggregate focus, we hold that the requirements of [these other sections of the statute] do not . . . create individual rights directly: . . . the lack of 'rights-creating' language and the absence of any focus on individual

entitlements, would prevent us from holding that [they] create individual rights." *Id.* at 1113-14 (quotation marks and citation omitted).

Because § 30(A) also lacks "rights-creating" language and "any focus on individual entitlements," and does not anticipate a judicially enforceable remedy, it shares the flaws that *Price* identified as fatal to the sections of the Housing and Community Development Act that we held to be unenforceable.

E

Our conclusion also accords with the First Circuit's analysis of the text of § 30(A) in *Long Term Care*. Although that case was concerned only with Medicaid providers, its reasoning applies also to recipients. The First Circuit noted that § 30(A) "has . . . broad[ ] coverage, sets forth general objectives, and mentions no category of entity or person specially protected" and "has no 'rights creating language' and identifies no discrete class of beneficiaries — two touchstones in *Gonzaga*'s analysis and of those earlier cases on which *Gonzaga* chose to build." *Long Term Care*, 362 F.3d at 56-57 (citations omitted). Instead, "[t]he provision focuses . . . upon the state as the person regulated rather than individuals protected, suggesting no intent to confer rights on a particular class of persons." *Id.* (quotation marks and citation omitted). The court concluded that, "[s]ubsection (30)(A) presents the same concern" that Justice Breyer identified in *Gonzaga*, namely that "much of the statute's key [substantive] language is broad and non-specific," *id.* at 58 (quoting *Gonzaga*, 536 U.S. at 292 (Breyer, J., concurring in the judgment)) (alteration in original), which suggests "that exclusive agency enforcement might fit the scheme better than a plethora of private actions threatening disparate outcomes." *Id.*

We do not believe the Third Circuit case, *Sabree v. Richman*, 367 F.3d 180 (3d Cir. 2004), which held that "it [is] dif-

ficult, if not impossible, as a linguistic matter, to distinguish the import of the relevant Title XIX language—'A State plan must provide'—from the 'No person shall' language of Titles VI and IX," *id.* at 190, to be applicable to our analysis of § 30(A). *Sabree* involved two sections of the Medicaid Act that are prefaced by language very different from that which introduces § 30(A). Those provisions specifically focus on entitlements available to "all eligible *individuals*" and "provide . . . for making medical assistance available . . . to all *individuals*" rather than on the "methods and procedures" by which a State can balance the often incompatible goals of "efficiency, economy, and quality of care" in the administration of Medicaid services. *Compare* 42 U.S.C. §§ 1396a(a)(8) and (a)(10) (emphases added) *with* 42 U.S.C. § 1396a(a)(30)(A). The Third Circuit observed that the phrase "A State plan must provide," when read together with the individual focus of 42 U.S.C. §§ 1396a(a)(8) and (a)(10), has an overall direction that is similar to the individually focused Title VI and IX language approved by the Court in *Gonzaga*. Such language is also notably absent from § 30(A).

Although 42 U.S.C. § 1396a(a) sets out a comprehensive list of requirements that a state plan must meet, it does not describe every requirement in the same language. Some requirements, such as those addressed in *Sabree*, focus on individual recipients, while others are concerned with the procedural administration of the Medicaid Act by the States and only refer to recipients, if at all, in the aggregate. Section 30(A) is one of the latter provisions; it is directly concerned with the State as administrator and only indirectly with recipients and providers as beneficiaries of the administered services. *Gonzaga* made it clear that simply being the intended beneficiary of a statute is not enough to demonstrate the intentional creation of an enforceable right.

F

**[6]** After *Gonzaga*, there can be no doubt that, to satisfy the *Blessing* test, a plaintiff seeking redress under § 1983 must

assert the violation of an individually enforceable *right* conferred specifically upon him, not merely a violation of federal law or the denial of a *benefit* or *interest*, no matter how unambiguously conferred. The text and structure of § 30(A) do not persuade us that Congress has, with a clear voice, intended to create an individual right that either Medicaid recipients or providers would be able to enforce under § 1983. Because we hold that § 30(A) fails the first prong of the *Blessing* test, we do not need to consider the second and third prongs.

## III

Sanchez and the Providers also appeal the district court's order granting the state officials' summary judgment motion with respect to the ADA and § 504 claims. They allege that California has failed to pursue HCBS waiver reimbursements under Medicaid aggressively, which, they further allege, could be used to set payment rates to community-based service providers at a level high enough to provide community-based care for all developmentally disabled persons who desire it. They request an injunction compelling the state officials to increase payments to community-based service providers to prevent what they characterize as the continuing, unnecessary segregation of developmentally disabled persons in institutions.

## A

[7] Both the ADA and § 504 prohibit discrimination on the basis of disability in the administration of a public program receiving Federal funding. Because of the nearly identical language of 42 U.S.C. § 12132 and § 504 of the Rehabilitation Act,[6] and because the Sanchez appellants are "qualified

---

[6]42 U.S.C. § 12132 (§ 202 of the ADA) provides, in part, that:

  [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the ben-

individual[s] with a disability" within the meaning of both statutes, for the purposes of this case we construe the two provisions as co-extensive. *Cf. Barnes v. Gorman,* 536 U.S. 181, 184-85 (2002); *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002); *Helen L. v. DiDario*, 46 F.3d 325, 331-32 (3d Cir. 1995).

**[8]** Regulations enacted pursuant to the ADA and § 504 both express a clear policy preference in favor of integrating developmentally disabled persons into the community over institutional care: one § 504 regulation requires programs that receive federal funding to "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons," 28 C.F.R. § 41.51(d) (2005); and one of the ADA's Title II regulations requires a public entity to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (2005). Again, for the purposes of this appeal, we interpret these provisions as co-extensive.

### B

In granting the state officials' motion for summary judgment on Sanchez's and the Providers' ADA and § 504 claims, the district court held that, drawing all reasonable inferences in favor of Sanchez and the Providers, they had failed to

---

efits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

29 U.S.C. § 794(a) (§ 504 of the Rehabilitation Act) provides, in part, that:

No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

establish any material factual dispute with respect to three key issues, all of which were necessary elements of a prima facie case for discrimination.

First, the court held that "[e]ven if unjustified institutionalization is occurring, [Sanchez and the Providers] have failed to show that an increase in wages and benefits for community-based direct care workers would remedy the alleged violation." Second, the court held that the relief proposed by Sanchez and the Providers is not a "reasonable modification" of California's current policies and practices because the $1.4 billion of extra expenditure they request would represent a forty percent increase in the State's budget for developmentally disabled services. Third, the court held that California already has in place an acceptable plan for deinstitutionalization, the disruption of which would involve a fundamental alteration of the State's current policies and practices in contravention of the Supreme Court's instructions in *Olmstead*. If we uphold any one of these conclusions, then the state officials must prevail.

1

**[9]** In *Olmstead*, the Supreme Court interpreted Title II of the ADA as forbidding the arbitrary segregation of the disabled in large state institutions. "Unjustified isolation," the Court held, "is properly regarded as discrimination based on disability." 527 U.S. at 597. However, the Court "recognize[d], as well, the States' need to maintain a range of facilities for the care and treatment of persons with divers mental disabilities, and the States' obligation to administer services with an even hand." *Id*. Justice Ginsburg, writing for a plurality of the Court, elaborated on this balancing of integration with competing policy and fiscal considerations, emphasizing that "[t]he State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless." *Id*. at 603. A State is only required to modify its current practices if the modifications necessary to satisfy the

request for increased deinstitutionalization are reasonable and do not fundamentally alter the nature of the State's services or program. *Id.*; 28 C.F.R. § 35.130(b)(7) (2005) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

[10] One state defense under the ADA, which was explicitly approved by the Court,[7] is the existence of a state plan for deinstitutionalization (an "*Olmstead* Plan"). The Court held that,

> [i]f . . . the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met.

*Id.* at 605-06.

The district court concluded that California is currently operating an acceptable deinstitutionalization plan, which, under *Olmstead*, should not be set aside or modified by the courts.

---

[7]We have held that, while "[t]he section of Justice Ginsburg's opinion discussing the state's fundamental alteration defense commanded only four votes . . . [b]ecause it relied on narrower grounds than did Justice Stevens' concurrence or Justice Kennedy's concurrence, both of which reached the same result, Justice Ginsburg's opinion controls." *Townsend v. Quasim*, 328 F.3d 511, 519 n.3 (9th Cir. 2003).

a

Under California law, all persons with developmental disabilities are entitled to free health care services. The Lanterman Developmental Disabilities Services Act, Cal. Welf. & Inst. Code, §§ 4500-4846, (the "Lanterman Act") requires the State to provide "[a]n array of services and supports . . . which is sufficiently complete to meet the needs and choices of each person with developmental disabilities, regardless of age or degree of disability, and at each stage of life and to support their integration into the mainstream life of the community." *Id.* § 4501. As described by the California Supreme Court,

> [t]he purpose of the statutory scheme is twofold: to prevent or minimize the institutionalization of developmentally disabled persons and their dislocation from family and community, and to enable them to approximate the pattern of everyday living of non-disabled persons of the same age and to lead more independent and productive lives in the community.

*Ass'n for Retarded Citizens v. Dep't of Developmental Servs.*, 696 P.2d 150, 152 (Cal. 1985) ("*ARC*")(citations omitted). The Lanterman Act gives DDS "jurisdiction over the execution of the laws relating to the care, custody, and treatment of developmentally disabled persons," Cal. Welf. & Inst. Code § 4416, but DDS's role "is basically limited to promoting the cost-effectiveness of the operations of [21 Regional Centers], and does not extend to the control of the manner in which they provide services or in general operate their programs." *ARC*, 696 P.2d at 152. The Lanterman Act also established 21 Regional Centers, independent, private non-profit community agencies under contract with the DDS, which coordinate services to "provide each developmentally disabled person with services that enable him to live . . . in the community." *Id.*

Through the Regional Centers, California provides care services for more than 180,000 developmentally disabled per-

sons. Of these, approximately 3,800 live in one of seven large, congregate institutions called Developmental Centers, which are located throughout the State and are operated by DDS. Although they are operated by DDS, it is the Regional Centers that determine if a consumer needs to be institutionalized in a Developmental Center and for how long. Regional Centers are required to develop an Individual Program Plan for each consumer. Once an individual plan is prepared, the responsible Regional Center must review it annually and modify it as necessary. An individual plan must include an assessment of the consumer's capabilities and limitations, a statement of time-limited objectives for improving his situation, a schedule of the type and amount of services necessary to achieve these objectives, and a schedule of periodic review to ensure that the services have been provided and the objectives met.

The ninety-eight percent of developmentally disabled persons who receive care in the community do so either at Intermediate Care Facilities, which are licensed to provide 24-hour nursing care and are scattered throughout the State; Community Care Facilities, which provide 24-hour, non-medical, community-based residential care for developmentally disabled persons in need of personal services, and supervision or assistance essential for self-protection; or through a variety of non-residential day programs and residential support services for developmentally disabled persons who live at home or in the community. It is the Regional Centers that select and contract with these community based service providers, which include Family Home Agencies, Foster Family Agencies, Independent Living Programs, Supported Living Services, and other support programs, such as vocational training, transportation, health care, respite services, community integration training, community activities support, adaptive skills training, behavior management, tutors, special education, recreation therapy, counseling, infant development, and speech pathology.

Care of developmentally disabled persons in these community-based programs may be eligible for Medicaid reimbursement pursuant to the HCBS waiver program. However, in order to qualify for Medicaid reimbursement, the recipient must be a low income person and the services must also be provided at a lower cost than if they were provided in a state institution. For qualifying recipients using qualifying services, Medicaid provides matching funds equal to approximately half of the cost of those services.[8]

The number of places in the HCBS waiver program is capped and a State must apply for any increases of the cap from the U.S. Department of Health and Human Services. Because of this, States often apply for, and receive, pre-approval for more places than they currently need. In 2002, California had more than 45,000 waiver places approved and received matching funds for approximately 35,000 registered persons. That cap has been approved to increase to approximately 70,000 by October, 2005. Because Sanchez and the Providers have only identified, at most, 1,125 allegedly unjustifiably institutionalized persons, there would be no reason for California to increase the number of places in its HCBS waiver program at this time and Sanchez and the Providers do not explicitly request such an increase.

b

In the 1980s, the DDS and the Regional Centers developed a program of Regional Resource Development Projects to enable the placement of more Developmental Center residents

---

[8]Under the Lanterman Act, all developmentally disabled persons are entitled to services funded out of the State's general funds. However, only seventy percent of these developmentally disabled persons qualify for Medicaid funding on the basis of financial need. In addition, many of the developmentally disabled persons eligible for services under the Lanterman Act do not have a level of impairment which would qualify them for matching funds from the federal government under California's HCBS waiver program.

in the community. The regional development projects assist the Regional Centers in identifying the services that Developmental Center residents need to live in the community. The regional development projects maintain a database that indicates whether a Developmental Center resident is recommended by his individual plan (either in the short-term or as a longer-term goal) to live in the community.

The DDS also utilizes a system of Community Placement Plans ("CPPs") to move Developmental Center residents to community residential settings. Community Placement Plans are individualized and reflect a partnership between the Regional Center, each individual and his family, the Developmental Center, and the Regional Resource Development Project. Because many recipients require specialized services that may be difficult to locate in some areas of California, part of a Community Placement Plan often involves the Regional Center enhancing and developing the local resources needed to move the consumer from a Developmental Center into the community.

Despite the comprehensive and accommodating nature of California's deinstitutionalization practices, barriers to individual community placement remain. One common barrier is the opposition of an individual's family to community placement. Although a family cannot veto a decision by the Regional Center to place a family member in the community, family involvement is often crucial in making a successful placement. Many current Developmental Center residents also exhibit complex and difficult behaviors, including self-injurious or aggressive behavior, that make community placement difficult, and many have serious and life-threatening medical conditions requiring 24-hour nursing care. Therefore, for the developmentally disabled that still reside in Developmental Centers, placement in the community can be a very challenging process.

Despite these obstacles, California successfully reduced the percentage of developmentally disabled persons residing in

Developmental Centers from six percent of the developmentally disabled population to two percent over the last decade. This success is due in part to the fact that the State's spending on community-based care increased significantly over that same period. The 2002/2003 CPP program allocated funding as high as $286,000 for the first year that a developmentally disabled person moves into the community. After the first year, the budget provided for an average of $102,000 per person to maintain the community placement. That budget represented an increase in total CPP funding of over sixty percent. Finally, and most significantly, § 4669.2 of the Lanterman Act authorizes DDS to bypass other restrictions to fund proposals for special projects. This means that DDS is authorized to fund certain services, such as those provided under the latest iteration of the CPP program, outside the existing rate structure. DDS has used this authority to fund services that encourage deinstitutionalization at much higher rates than in the recent past.

Sanchez and the Providers argue that, although California has achieved significant success moving institutionalized persons into the community, in recent years the rate of community placement has slowed. Sanchez and the Providers have shown that for the three years prior to the district court's decision, the number of admissions to Developmental Centers was actually greater than the number of discharges, although the overall residential population declined, in part due to the natural deaths of residents. However, the record supports the district court's finding that this recent decline in the rate of community placements has been due to the fact that those persons with the least severe disabilities or with the best prospects for integration into the community were deinstitutionalized first. Those who remain in Developmental Centers have, on average, more, and more severe, disabilities and face higher barriers to deinstitutionalization, including family or personal opposition. The 2% of developmentally disabled persons who still reside in Developmental Centers are more than four times more likely to have serious medical

problems, more than six times more likely to have severe behavior problems, and 69% of current residents are among the top 10% of all persons with the most acute levels of retardation. In addition, since 1998, the number of persons admitted to Developmental Centers pursuant to court orders finding them incompetent to stand trial (so called "forensic" admittances) has increased dramatically.[9]

2

The district court concluded that California's commitment to the deinstitutionalization of those Developmental Center residents for whom community integration is desirable, achievable and unopposed, is genuine, comprehensive and reasonable. This conclusion was based on evidence from the record, which showed that "[o]verall, California's expenditures for individuals in community settings increased 196% [between 1991 and 2001], while caseload . . . increased fifty-five percent in the same period," that California has applied for increased places under the HCBS waiver program, and that, "[between 1996 and 2000], California reduced its institution population by twenty percent." DDS has also budgeted to develop 42 new Community Care Facilities and ten new Intermediate Care Facilities, and anticipates a reduction in institutionalization that would allow it to close at least one Developmental Center by 2007. We are satisfied, therefore, that the district court's conclusion that California's "plan is comprehensive, effective, and moving at a reasonable pace," is supported by the record.

3

In *Olmstead*, the Court recognized that a State must have sufficient leeway "[t]o maintain a range of facilities and to

---

[9]The district court noted that, "[o]f the 436 people admitted into Developmental Centers since January, 1999, almost forty percent were committed by a court."

administer services with an even hand," 527 U.S. at 605, and that courts should be sympathetic to fundamental alteration defenses against proposed modifications to state services and programs for care of the disabled.[10] *Id.*; *see also Townsend*, 328 F.3d at 520.

[11] Concomitant with this leeway is a recognition that, when there is evidence that a State has in place a comprehensive deinstitutionalization scheme, which, in light of existing budgetary constraints and the competing demands of other services that the State provides, including the maintenance of institutional care facilities, *see Olmstead*, 527 U.S. at 597, is "effectively working," *id.* at 605, the courts will not tinker with that scheme. *Olmstead* does not require the immediate, state-wide deinstutionalization of all eligible developmentally disabled persons, nor that a State's plan be always and in all cases successful. *Id.* at 606 ("It is reasonable for the State to ask someone to wait until a community placement is available.") (endorsing position of State of Georgia). The record supports the district court's finding that California has a successful record of personalized evaluations leading to a reasonable rate of deinstutionalization and, moreover, that California has undertaken to continue and to increase its efforts to place current residents of Developmental Centers into the commu-

---

[10]*Olmstead* also specifically disapproved two methods of analyzing whether a requested modification is financially reasonable, or whether it amounts to a "fundamental alteration" of a State's services. First, it held that measuring the cost of placing one or two disabled people in the community against the entirety of the State's budget for treatment of that disability is inappropriate because the requested relief will almost always appear to be a reasonable modification. 527 U.S. at 603-604. Second, the Court held that it was not appropriate merely to compare the cost of institutionalization against the cost of community-based services, because that comparison would not account for the State's financial obligation to continue to operate partially full institutions with fixed overhead costs. *Id.* at 604 n.15. Even if a community-based placement would be less costly than an institutional placement for a specific individual, the State must still factor into its overall budget the fixed cost of maintaining some necessary number of state institutions.

nity when such placement is feasible. Sanchez's and the Providers' requested relief would require us to disrupt this working plan and to restrict impermissibly the leeway that California is permitted in its operation of developmentally disabled services under *Olmstead*.

IV

Congress did not unambiguously create an individually enforceable right in § 30(A) that would be remediable under § 1983 either by recipients or providers of Medicaid services. Furthermore, Sanchez's and the Providers' requested relief under Title II of the ADA and § 504 of the Rehabilitation Act would require the "fundamental alteration" of a comprehensive, working plan for deinstitutionalization in contravention of *Olmstead*.

AFFIRMED.