**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE ARC OF WASHINGTON STATE
INC., a Washington Corporation on
behalf of its members; GUADALUPE
E. CANO, by and through her
guardian Delia C. Cano; OLIVIA
MURGUIA, by and through her
guardian Teri L. Hewett; LORIANNE
V. LUDWIGSON, by and through her
guardians Donald and Sheryl
Ludwigson,
          *Plaintiffs-Appellants,*

    v.

DENNIS BRADDOCK, in his official
capacity as the Secretary of the
Washington Department of Social
and Health Services;* DEPARTMENT
OF SOCIAL & HEALTH SERVICES
STATE OF WASHINGTON; FINANCIAL
MANAGEMENT OFFICE OF THE
STATE OF WASHINGTON; MARTY
BROWN, in his official capacity as
Director of the Washington Office
of Financial Management;
TIMOTHY R. BROWN, in his official
capacity as the Director of the
Washington State Division of
Developmental Disabilities;

No. 03-35605

D.C. No.
CV-99-05577-FDB

ORDER AND
OPINION

---

*Dennis Braddock is substituted for his predecessor, Lyle Quasim, as Secretary of the Washington Department of Social and Health Services. Fed. R. App. P. 43(c)(2).

14111

DEVELOPMENTAL DISABILITIES
DIVISION; CHRISTINE GREGOIRE,** in
her capacity as Governor of the
State of Washington,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Washington
Franklin D. Burgess, District Judge, Presiding

Argued October 4, 2004
Submitted March 29, 2005
Seattle, Washington

Filed October 14, 2005

Before: Alex Kozinski, Ferdinand F. Fernandez, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Kozinski;
Concurrence by Judge Fernandez

---

**Christine Gregoire is substituted for her predecessor, Gary Locke, as
Governor of the State of Washington. Fed. R. App. P. 43(c)(2).

**COUNSEL**

Susan Delanty Jones, Preston Gates & Ellis LLP, and Larry A. Jones and Christine Thompson Ibrahim, Seattle, Washington, for the plaintiffs-appellants.

Rob McKenna, Attorney General, and William M. Van Hook and Edward J. Dee, Assistant Attorneys General, Olympia, Washington, for the defendants-appellees.

**ORDER**

The petition for rehearing is GRANTED. The petition for rehearing en banc is DENIED as moot. The opinion filed March 29, 2005, and reported at 403 F.3d 641, is withdrawn, and is replaced by the Opinion and concurrence, 03-35605. Further petitions for rehearing and rehearing en banc will be accepted. *See* Fed. R. App. P. 35; Fed. R. App. P. 40.

**OPINION**

KOZINSKI, Circuit Judge:

We navigate once again the murky waters between two statutory bodies: Medicaid and the Americans with Disabilities Act (ADA). Specifically, we examine whether a state violates the ADA when it limits the number of people that can participate in a Medicaid waiver program providing disabled persons with alternatives to institutionalization.

**Facts**

Medicaid is a program under which the federal government provides financial assistance to participating states to help them furnish care to low-income persons. If a state chooses to

participate—which all fifty do—it must submit a plan for approval by the federal regulators. *See Children's Hosp. & Health Ctr.* v. *Belshe*, 188 F.3d 1090, 1093 (9th Cir. 1999).

Washington State Department of Social and Health Services (the Department) devised a plan which provided for two types of services to certain Medicaid-eligible developmentally disabled individuals. First, it funded Intermediate Care Facilities for the Mentally Retarded (ICF/MR), which are generally large public institutions made available to any person who meets the eligibility requirements for admission. *See* 42 U.S.C. § 1396d(a)(15), (d). In addition, the plan used some ICF/MR funds to support smaller, privately operated residences that serve between six and forty individuals each. Second, in an effort to offer alternatives to institutionalization, the Department sought and received a waiver of certain ICF/MR rules. *See id.* § 1396n(c)(1); 42 C.F.R. § 441.300. That waiver program is known as the Home and Community-Based Services waiver (HCBS).[1] HCBS provides a variety of noninstitutional care options for qualified persons, enabling them to remain more integrated in the community than if they were institutionalized.

Central to the question presented to us is the limitation on HCBS services to a particular number of individuals—9,977 when this action was filed. Such a cap is expressly contemplated by the Medicaid waiver provisions, *see* 42 U.S.C. § 1396n(c)(9), (10); 42 C.F.R. § 441.303(f)(6), and there is no indication that Washington is failing to use all of its allocated slots. The Arc of Washington State, Inc., and three developmentally disabled individuals (collectively the Arc), complain

---

[1]Since this lawsuit was initiated, the HCBS program has been replaced by four new Medicaid waiver programs. Because of the similarities between the HCBS program and the new programs, we will refer to the HCBS program in the present tense. In a separate memorandum disposition, we reject the Department's argument that these programmatic changes have rendered the case moot.

that because the program is full, eligible individuals must await openings before they can be enrolled. The Arc asserts that Title II of the ADA, Pub. L. No. 101-336, § 202, 104 Stat. 327, 337 (codified at 42 U.S.C. § 12132), prevents Washington from maintaining any fixed HCBS cap. Instead, it argues, the state must make the HCBS waiver program available to every developmentally disabled person who could qualify for an ICF/MR setting, but who prefers HCBS. The district court disagreed, and granted partial summary judgment against the Arc.[2]

## Discussion

[1] 1.   As an alternative to institutionalized care for the disabled, the Medicaid statute and regulations allow states to apply for waiver programs for home and community-based care. However, Congress envisioned such programs as limited in scope, and therefore included the following language in 42 U.S.C. § 1396n(c), the waiver portion of the statute:

> (9) In the case of any waiver under this subsection which contains a limit on the number of individuals who shall receive home or community-based services, the State may substitute additional individuals to receive such services to replace any individuals who die or become ineligible for services under the State plan.

> (10) The Secretary shall not limit to fewer than 200 the number of individuals in the State who may receive home and community-based services under a waiver under this subsection.

The regulations implementing the statute go farther, requiring

---

[2]The Arc also appeals the decertification of its class, and the dismissal of its action against the Department and others. We dispose of those claims in a separate memorandum disposition.

states to place a limit on the number of waiver program participants, and requiring states to adhere to the limitation:

> The State must indicate the number of unduplicated beneficiaries to which it intends to provide waiver services in each year of its program. This number will constitute a limit on the size of the waiver program unless the State requests and the Secretary approves a greater number of waiver participants in a waiver amendment.

42 C.F.R. § 441.303(f)(6).

**[2]** Approaching the problem from the opposite direction, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The regulations that flesh out that provision state: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

**[3]** We have previously described the ADA as containing an "integration mandate." *See Townsend* v. *Quasim*, 328 F.3d 511, 515-18 (9th Cir. 2003). Under this mandate, states are required to provide care in integrated environments for as many disabled persons as is reasonably feasible, so long as such an environment is appropriate to their mental-health needs. *See id.*; *see also Olmstead* v. *L.C. ex rel. Zimring*, 527 U.S. 581, 592, 600-01 (1999). This requirement serves one of the principal purposes of Title II of the ADA: ending the isolation and segregation of disabled persons. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d). In order to comply with the integration mandate, states are required to make "reasonable modifications in policies, practices, or procedures" that are

"necessary to avoid discrimination on the basis of disability."
*Id.* § 35.130(b)(7).

**[4]** The integration mandate has its own limitations. In
administering services, programs and activities, a state is not
required to make "modifications [that] would fundamentally
alter the nature of the service, program, or activity." *Id.* The
Supreme Court has instructed courts to be sympathetic to fun-
damental alteration defenses, and to give states "leeway" in
administering services for the disabled. *Olmstead*, 527 U.S. at
605; *see Townsend*, 328 F.3d at 520. Despite the integration
mandate, therefore, we have held that we normally "will not
tinker with" comprehensive, effective state programs for pro-
viding care to the disabled. *See Sanchez* v. *Johnson*, 416 F.3d
1051, 1067-68 (9th Cir. 2005).

**[5] 2.**   The Arc's claim is that Washington's HCBS pro-
gram is too small to accommodate the state's population of
eligible participants. According to the Arc, Washington must
request federal authorization for an increase in the size of its
HCBS waiver program. Whether the state may be required to
seek such an increase depends on whether this would be a
"reasonable modification" (which is required) or a "funda-
mental alteration" (which is not).

**[6]** The Supreme Court has addressed this distinction in the
specific context of Medicaid waiver programs for the dis-
abled. In *Olmstead* v. *L.C. ex rel. Zimring*, the Court recog-
nized that "[t]he State's responsibility, once it provides
community-based treatment to qualified persons with disabili-
ties, is not boundless." 527 U.S. at 603.[3] Although the "unjus-

---

[3]"We have held that, while '[t]he section of Justice Ginsburg's opinion
discussing the state's fundamental alteration defense commanded only
four votes . . . [b]ecause it relied on narrower grounds than did Justice Ste-
vens' concurrence or Justice Kennedy's concurrence, both of which
reached the same result, Justice Ginsburg's opinion controls.' " *Sanchez*,
416 F.3d at 1064 n.7 (quoting *Townsend*, 328 F.3d at 519 n.3) (alterations
in original).

tified isolation" of disabled persons in institutions would violate the ADA, the Court recognized certain state justifications that would defeat an ADA-based challenge, for example "the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities, and the States' obligation to administer services with an even hand." *Id.* at 597. Further, a state could avoid having to modify its waiver program if it "were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace." *Id.* at 605-06.

The Supreme Court in *Olmstead* did not consider whether a forced change in the waiver program's cap would constitute a fundamental alteration, because the state's program in that case was far from full. *See id.* at 601. The modifications requested by the plaintiffs could therefore be implemented without requiring the state to request a higher program cap. Thus, the case was remanded for consideration of the appropriate relief in light of the state's reasons for refusing to implement the modifications. *See id.* at 587.

We have also twice explored the boundary between "reasonable modifications" and "fundamental alterations" in the context of Medicaid waiver programs for the disabled. In *Townsend* v. *Quasim*, we held that a state could not maintain a waiver program that provided integrated care only for those disabled persons falling below a certain income level (the "categorically needy"), while forcing disabled persons with a higher income level (the "medically needy") to remain institutionalized. *See* 328 F.3d at 520. The state's program, we said, which "explicitly provid[ed] only nursing-home based long term care services to the medically needy, may be read to facially discriminate against disabled persons." *Id.* at 518 n.2. Elimination of this facial discrimination, we determined, was a reasonable modification that the ADA compelled the state to undertake, unless the state could demonstrate that the rem-

edy would constitute a fundamental alteration. *See id.* at 520. One basis for finding a "fundamental alteration" would have been for the state to demonstrate that the remedy would force it "to apply for additional Medicaid waivers in order to provide community-based services to medically needy disabled persons." *Id.* at 519. Based on the record before us in *Townsend*, however, it was impossible to determine whether including the medically needy in the waiver program would force the state to undertake a fundamental alteration—such as requesting an increase in the program's cap. We thus remanded the case for further factual development. *See id.* at 520.

In *Sanchez* v. *Johnson*, it was the size of the waiver program itself that the plaintiffs wanted modified, not the method for determining eligibility. *See* 416 F.3d at 1063.[4] We rejected the claim outright, finding the state "already ha[d] in place an acceptable plan for deinstitutionalization, the disruption of which would involve a fundamental alteration of the State's current policies and practices in contravention of the Supreme Court's instructions in *Olmstead*." *Id.* at 1063, 1067. In particular, we noted that the state's "commitment to the deinstitutionalization of those [disabled persons] for whom community integration is desirable, achievable and unopposed, is genuine, comprehensive and reasonable." *Id.* at 1067. The record provided ample support for our holding: The state had repeatedly applied for an increase in the size of the waiver program, state expenditures for integrated community-based treatment had consistently increased over the prior decade, and the state's institutionalized population had decreased by twenty percent over the prior four years. *See id.* With such a program in place, we held, the ADA did not impose a requirement that the state quicken the pace of deinstitutionalization by expanding the program.

---

[4]The plaintiffs in *Sanchez* did not request an increase in the waiver program's cap. *See id.* at 1065. Instead, they requested an additional $1.4 billion in funding for developmentally disabled services. *See id.* at 1063.

**[7]** In sum, our approach has been consistent with the Supreme Court's instructions: So long as states are genuinely and effectively in the process of deinstitutionalizing disabled persons "with an even hand," we will not interfere. *See Olmstead*, 527 U.S. at 605-06. The state program at issue in *Sanchez* passed this test. The program was successfully integrating disabled persons into the community, and—once space opened up—was available to every disabled person capable of profiting from deinstitutionalized care. The mere existence of a cap on the waiver program's funding did not violate the ADA. The *Townsend* program, however, failed the test because the state there categorically refused—at any pace—to integrate an entire segment of disabled persons into community-based care programs. Only disabled persons whose income qualified them as "categorically needy" were eligible to enter the waiver program. *See Townsend*, 328 F.3d at 514. The "medically needy" were forced to either remain in institutionalized care forever or receive no care at all, regardless of their mental-health needs.

**[8] 3.** Here, as in *Sanchez*, it is the waiver program's size itself that is under attack. Plaintiffs acknowledge that the state's HCBS program is capped at 9,977 disabled persons, and the program is operating at capacity. Yet they argue the program is not large enough. Thus, as in *Sanchez*, we must determine whether the state's HCBS program is "an acceptable plan for deinstitutionalization, the disruption of which would involve a fundamental alteration." *Sanchez*, 416 F.3d at 1063. And, as in *Sanchez*, the record in this case already contains all we need to make this determination. There is thus no need for further factual development as there was in *Townsend*.

**[9]** The record reflects that Washington's commitment to deinstitutionalization is as "genuine, comprehensive and reasonable" as the state's commitment in *Sanchez. Id.* at 1067. Washington's HCBS program is substantial in size, providing integrated care to nearly 10,000 Medicaid-eligible disabled

persons in the state. *See* Decl. of Timothy Brown ¶ 5. The waiver program is full, and there is a waiting list that admits new participants when slots open up. *See* Dist. Court Order, Nov. 17, 2000; *cf. Olmstead*, 527 U.S. at 605-06. Unlike in *Townsend*, all Medicaid-eligible disabled persons will have an opportunity to participate in the program once space becomes available, based solely on their mental-health needs and position on the waiting list.

Further, the size of Washington's HCBS program increased at the state's request from 1,227 slots in 1983, to 7,597 slots in 1997, to 9,977 slots beginning in 1998. Decl. of Susan E. Poltl ¶ 7. The annual state budget for community-based disability programs such as HCBS more than doubled from $167 million in fiscal year 1994, to $350 million in fiscal year 2001, despite significant cutbacks or minimal budget growth for many state agencies. *See* Decl. of Timothy Brown ¶ 7. During the same period, the budget for institutional programs remained constant, while the institutionalized population declined by 20%. *See id.* Today, the statewide institutionalized population is less than 1,000.

**[10]** The Department's Division of Developmental Disabilities (DDD) has also seen its biennial budget grow steadily from $750 million in 1995 to over $1 billion in 1999, making it one of the fastest growing budgets within the Department. *See id.* at ¶¶ 8-9. Family support services, given to families of DDD clients living at home, have grown even faster, benefitting from a 250% budget growth over five years. *See id.* There is thus no indication that the state is neglecting its responsibilities to the HCBS program relative to other programs.

**[11]** Washington's commitment to deinstitutionalization in this case appears as genuine as California's commitment in *Sanchez*. As we noted in *Sanchez*:

> [W]hen there is evidence that a State has in place a comprehensive deinstitutionalization scheme, which,

> in light of existing budgetary constraints and the competing demands of other services that the State provides, including the maintenance of institutional care facilities, *see Olmstead*, 527 U.S. at 597, is "effectively working," *id.* at 605, the courts will not tinker with that scheme. *Olmstead* does not require the immediate, state-wide deinstitutionalization of all eligible developmentally disabled persons, nor that a State's plan be always and in all cases successful. *Id.* at 606 ("It is reasonable for the State to ask someone to wait until a community placement is available.")
>
> . . . .

*Sanchez*, 416 F.3d at 1067-68. We see no cause for tinkering with Washington's HCBS program.

[12] **4.** We do not hold that the forced expansion of a state's Medicaid waiver program can *never* be a reasonable modification required by the ADA. What we do hold is that, in this case, Washington has demonstrated it has a "comprehensive, effectively working plan," *Olmstead*, 527 U.S. at 605, and that its commitment to deinstitutionalization is "genuine, comprehensive and reasonable," *Sanchez*, 416 F.3d at 1067. Washington's HCBS program (1) is sizeable, with a cap that has increased substantially over the past two decades; (2) is full; (3) is available to all Medicaid-eligible disabled persons as slots become available, based only on their mental-health needs and position on the waiting list; (4) has already significantly reduced the size of the state's institutionalized population; and (5) has experienced budget growth in line with, or exceeding, other state agencies. Under such circumstances, forcing the state to apply for an increase in its Medicaid waiver program cap constitutes a fundamental alteration, and is not required by the ADA.

\* \* \*

**AFFIRMED** on the issue discussed in this opinion.[5] The parties shall bear their own costs on appeal.

---

FERNANDEZ, Circuit Judge, concurring:

I do not generally disagree with the majority opinion, but I continue to be of the opinion that the ADA must yield to the specific cap provision discussed in the opinion. For that reason, I incorporate here the opinion in *The Arc of Washington State Inc. v. Braddock*, 403 F.3d 641 (9th Cir. 2005), which is now mine alone. I believe that it says quite enough to properly resolve this case without placing a higher burden upon the states than the law requires and without being unduly obscurant.

Thus, I concur.

---

[5]We reverse and remand on certain issues in this case, which are considered in a separate memorandum disposition.