Richard PRICE, et al., Plaintiffs,

v.

CITY OF STOCKTON, CALIFORNIA, et al., Defendants.

No. CIV.S–02–65 LKK/KJM.

United States District Court, E.D. California.

Aug. 9, 2005.

---

Shirley Rose Edwards, Amy Yeunjean Choi, Kristina L. Burrows, California Rural Legal Assistance, Inc., Stockton, CA, Darryl Scott Chang, Relman & Associates, Washington, DC, Deanna R. Kitamura, Richard A. Rothschild, Western Center on Law and Poverty, Los Angeles, CA, S. Lynn Martinez, Western Center of Law and Poverty, Deborah Ann Collins, Michael F. Rawson, The Public Interest Law Project, Oakland, CA, Ilene Janet Jacobs, California Rural Legal Assistance, Marysville, CA, Jack Egan Daniel, California Rural Legal Assistance, Fresno, CA, Stephanie Elisabeth Haffner, Long Beach, CA, for Plaintiffs.

Lee C. Rosenthal, Goldfarb and Lipman, Oakland, CA, Michael Thomas Rishwain, City of Stockton City Attorney's Office, Stockton, CA, for Defendants.

## ORDER

KARLTON, Senior District Judge.

This action arises out of the City of Stockton's aggressive enforcement of the City's housing codes which seeks to acquire downtown single-room occupancy hotels (SROs), which house low income and very low income persons. Plaintiffs are, *inter alia*, low income individuals who were evicted from the SROs in downtown Stockton. They brought this action seeking an injunction, alleging that defendants are violating duties arising under the Housing and Community Development Act, 42 U.S.C. §§ 5301 *et seq.*, the Uniform Relocation Act, 42 U.S.C. § 4601, the California Community Redevelopment Law, Cal. Health & Safety Code §§ 33000 *et seq.*, and the California Relocation Assistance Act, Cal Gov't Code §§ 7260 *et seq.*

On May 2, 2002, the court granted a preliminary injunction in plaintiffs' favor. This matter now comes before the court on plaintiffs' motion to amend that preliminary injunction. I decide the motion based on the papers and pleadings filed herein and after oral argument.

## I.

### FACTUAL BACKGROUND

In 1961, the City of Stockton and its Redevelopment Agency adopted the West End Urban Renewal Project Development Plan ("West End Redevelopment Plan") to redevelop downtown Stockton. Preliminary Injunction Order ("PI Order") at 2. The Redevelopment Plan's most recent amendment in 1991 authorized the Redevelopment Agency to acquire all real property in the project areas for development purposes, and to remove the blighting in-

fluence of surrounding properties. *Id.* To further redevelopment of downtown Stockton, the City established "a capital program" to demolish buildings and purchase properties to expand available parking in the area. *Id.*

In June 2001, the City Council met in a closed session to discuss the possibility of acquiring property in downtown Stockton. The City's acquisition list included twenty nine downtown properties, including many SROs.[1] *Id.* at 2–3. Two days after the City Council meeting, the City and its Redevelopment Agency began a policy of zero tolerance for code enforcement violations in downtown hotels. *Id.* at 3. The City Manager used the newly-created Community Health Action Team ("CHAT"), a group composed of five City employees, two in the Stockton Police Department and three in the Department of Housing and Redevelopment, to implement its policy. *Id.* Under the policy, hotels that were cited with code enforcement violations could not re-rent rooms that became vacant until all code violations were corrected, without regard to the actual health and safety threat of violations in particular rooms. *Id.* If the hotels failed to correct these violations, the hotels had to be vacated and closed. *Id.*

As part of their code enforcement scheme, defendants cited sixteen of the twenty nine properties on defendants' 2001 acquisition list, which are all downtown SROs and lower income apartments. *Id.* at 3–4. Between July 2001 and December 2002, defendants vacated and closed nine of the properties on their acquisition list (the Commercial, Cosmos, Earle, El Teco-

lote, James, La Verta, Mariposa, Steve's and Terry Hotels) plus the Land Hotel (not on its acquisition list), resulting in the removal of 351 lower income residential units from the West end redevelopment Plan area. *Id.* at 4 and fn. 3; *see also* Decl. of Deborah Collins in Support of Pl's Mot. to Amend PI (Collins Dec.) ¶ 11, Ex. 10 at 637.

Plaintiffs allege that defendants continue to pursue their downtown redevelopment plan by acquiring, demolishing, and threatening to demolish many of the SROs that were closed.

Consistent with their redevelopment scheme, defendants acquired the Terry Hotel and commenced an eminent domain action against the Commercial Hotel in 2002. *See* PI Order at 25; *see also* Burrows Dec. ¶ 14, Exs. 22, 23. Both were purportedly needed for public parking purposes. *Id., see also* Collins Dec. ¶ 15, Ex. 14.[2] The Toni Hotel was acquired on March 26, 2002 to support parking for the Cineplex development (currently referred to as the City Center Cinema Project). Burrows Dec. ¶ 4, Exs. 11, 12; ¶ 12, Ex. 20. The City acquired El Tecolote on May 9, 2002, and the Earle Hotel on July 11, 2002. Burrows Dec. ¶¶ 5, 6, Exs. 13, 14. The City Council approved an agreement to purchase the Main Hotel, also to provide parking in January 2003. Collins Dec. ¶ 15, Ex. 14. On October 5, 2004, defendants obtained a condemnation order in their eminent domain action against the La Verta Hotel. Burrows Dec. ¶ 8, Ex. 16. The Land Hotel was acquired as part of the settlement and dismissal by the property owner of an action in this Court.[3]

---

1. The properties on defendants' acquisition list include various single-room occupancy hotels located within the West End Project area, including the Commercial, Cosmos, Delta, Earle, El Tecolote, Fair, James, La Verta, Mariposa, Merill, Oxford, Phoenix, Steve's, Terry and Toni hotels, as well as the Hunter Apartments. *Id.*

2. In January 2003, staff reported to the City Council that it was still in the process of acquiring the Commercial Hotel "for the purpose of parking expansion." *Id.*

3. The court may take judicial notice of the pleadings and record in the action, *Portale v.*

Defendants demolished Hunter Apartments in April 2002, just prior to issuance of the Preliminary Injunction, for a loss of 24 lower income units. Collins Dec. ¶ 10, Ex. 9 at 570; Choi Dec. ¶ 3, Ex. 1. In January 2003, the CHAT reported that demolition of the Mariposa and Steve's Hotels awaits "Federal Court ruling." Collins Dec. ¶ 11, Ex. 10 at 642.

On December 14, 2004, the defendants approved the demolition of and shortly thereafter demolished the Toni hotel, resulting in the permanent loss of eight more SRO units. Burrows Dec. ¶ 3, Ex. 10; Burrows Dec. ¶¶ 12, 13, Exs. 20, 21. Plaintiffs allege that the defendant agency, however tardily, adopted a replacement housing plan for the eight Toni Hotel units to permit demolition to occur. *Id.* According to plaintiffs, the Agency failed to assure that persons displaced by the downtown project have a priority for the purported eight "replacement" units. *See* Burrows Dec. ¶¶ 12, 13, Exs. 20, 21; Decl. of Stanford Cobbs in Support of Pl's Mot. to Amend PI (Cobbs 2005 Dec.), ¶ 4; Decl. of Dwain Henderson in Support of Pl's Mot. to Amend PI (Henderson 2005 Dec.), ¶ 4.

Plaintiffs have submitted evidence indicating that additional low-income housing may soon be removed from the market. For example, in 2003, the Agency designated a square block that includes the Delta Hotel property as a Master Development Area and obtained a development proposal to construct a gated and landscaped parking lot that would extend right through the Delta parcel. Collins Dec. ¶ 17, 18, 19, Exs. 16, 17, 18.

According to the plaintiffs, at least 351 lower income units were removed from the affordable housing market as a result of the "code enforcement" closures in 2001 and 2002. Thirty-two lower income units

(Hunter and Toni) have been demolished. Another seven to eight SRO's, with a total of 349 units, already acquired by defendants remain at imminent risk of demolition.

## II.

## PROCEDURAL BACKGROUND

Plaintiffs filed this action in January 2002 against numerous defendants, including the City of Stockton and the Stockton Redevelopment Agency. The suit sought declaratory and injunctive relief and a writ of mandate for alleged violations of state and federal relocation assistance, replacement housing, fair housing and other statutes claimed to be applicable to defendants' displacement of hundreds of downtown residents and closure of nine downtown SRO's. *See* Compl.

In February 2002, plaintiffs sought a preliminary injunction to restrain defendants from vacating, converting and demolishing those residential units without providing adequate relocation assistance or adopting and implementing replacement housing plans. Plaintiffs sought the Preliminary Injunction pursuant to the federal Housing and Community Development Act ("HCDA"), 42 U.S.C. §§ 5301 *et seq.*, the California Relocation Assistance Act, Cal. Gov't Code § 7260, and federal and state fair housing statutes, 42 U.S.C. §§ 3601 *et seq.* and Cal. Gov't Code §§ 12900 *et seq.*

Finding that plaintiffs were likely to succeed on the merits of their HCDA § 104(d) and state law relocation assistance claims, and that the balance of hardships tipped decidedly in plaintiffs' favor, this Court issued a preliminary injunction on May 2, 2002, as modified on June 14, 2002. That preliminary injunction restrained defendants, among other things, from demolishing or converting any of the downtown

*City of Stockton,* Case No. Civ. S–02–988 LKK/KJM.

residential properties until they adopted and implemented a valid replacement housing plan in accordance with HCDA. *See* Order dated May 2, 2002 at 36 ¶ 2; Order dated June 14, 2002 at 1 ¶ 1. Determining that plaintiffs were likely to prevail on their HCDA claims, the court did not reach plaintiffs' fair housing claims. *Id.* at 33–34.

Upon defendants' appeal, on December 6, 2004, the Ninth Circuit affirmed the preliminary injunction order with respect to the relocation assistance requirements. *Price v. City of Stockton,* 390 F.3d 1105, 1118 (9th Cir.2004). It reversed and remanded, however, as to the court's prohibition of demolition or conversion of the hotels absent a replacement housing plan holding that plaintiffs cannot privately enforce the replacement housing provisions of HCDA. *Id.* at 1113–14, 1118.

In the present motion, plaintiffs assert that the defendants are in violation of California's Community Redevelopment Law (CRL), codified at Health and Safety Code §§ 33000 *et seq.,* the California Fair Housing & Employment Act ("FEHA"), Cal. Gov't Code §§ 12900 *et seq.,* and the federal Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* Based upon that contention, they seek to have the preliminary injunction amended to prevent the demolition or conversion of the downtown single-room occupancy hotels and apartments defendants removed from the affordable housing market in 2001 and 2002, pending trial of the action, unless they first adopt a lawful replacement housing plan.

### III.

### STANDARD OF REVIEW

 The Ninth Circuit has adopted two tests for determining the propriety of a preliminary injunction. The moving party must demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2)

that serious questions are raised and the balance of hardships tips sharply in favor of the moving party. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills,* 321 F.3d 878, 881 (9th Cir.2003). These two formulations are not different tests but represent two points on a sliding scale in which the required probability of success decreases as the degree of irreparable harm increases. *Oakland Tribune, Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374, 1376 (9th Cir.1985). In addition, a court in either formulation of the test must also take into account the public interests that are implicated by the relief sought when it is balancing the harms. *Caribbean Marine Services Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir.1988).

 The California standard is quite similar to the federal standard. In deciding whether to issue a preliminary injunction, a court must weigh two 'interrelated' factors: (1) the likelihood that the moving party will ultimately prevail on the merits and (2) the relative harm to the parties from the issuance or non-issuance of the injunction. *Butt v. State of California,* 4 Cal.4th 668, 677–78, 15 Cal.Rptr.2d 480, 842 P.2d 1240 (1992); *Cohen v. Board of Supervisors,* 40 Cal.3d 277, 286, 219 Cal. Rptr. 467, 707 P.2d 840 (1985). "The trial court's determination must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction ...." *Butt,* 4 Cal.4th at 677–78, 15 Cal.Rptr.2d 480, 842 P.2d 1240 (citations omitted).

### IV.

### ANALYSIS

Plaintiffs contend that defendants' closure, acquisition, and threatened demolition and conversion of the downtown SROs are all part of defendants' West End Rede-

velopment Plan. They assert that, because the redevelopment project is the subject of a written agreement between the Agency and the City, and the Agency financially assisted the project, the Agency must adopt a replacement housing plan pursuant to the CRL. I examine these contentions below.

## A. THE COMMUNITY REDEVELOPMENT LAW

The CRL provides that prior to removal of lower income units from the affordable housing market as part of a redevelopment project, redevelopment agencies must adopt a replacement housing plan that will ensure the units are replaced within four years of removal pursuant to Cal. Health & Safety Code §§ 33413 and 33413.5. In enacting the CRL, the state legislature intended to protect and "to expand the supply of low- and moderate-income housing." Cal. Health & Safety Code § 33071. To assure the development of affordable housing, redevelopment agencies are required to comply with CRL's "inclusionary" or "production" requirements as part of certain redevelopment plans. *Id.* at § 33413(b). Specifically, the CRL requires replacement of lower income housing that is destroyed or removed from the housing market as part of a redevelopment

project.[4] The "replacement" units must be available at an affordable housing cost at the same or a lower income level as the persons displaced from the units that are destroyed or removed. *Id.*[5]

Further, a redevelopment agency must adopt a replacement housing plan well in advance of removing the units:

> Not less than 30 days prior to the execution of an agreement for acquisition of real property, or the execution of an agreement for the disposition and development of property, or the execution of an owner participation agreement, which agreement would lead to the destruction or removal of dwelling units from the low- and moderate-income housing market, the agency shall adopt by resolution a replacement housing plan . . . .

Cal. Health & Safety Code § 33413.5. The plan must specify the general location of the replacement housing units, an adequate means of financing those units, the number of units housing lower income persons and families that will be removed from the market, and the timetable for meeting the plan's relocation, rehabilitation and replacement housing obligations. *Id.* Prior to the adoption of the replacement housing plan, however, "the agency shall make available a draft of the pro-

---

4. The statute provides:

Whenever dwelling units housing persons and families of low or moderate income are destroyed or removed from the low- and moderate-income housing market as part of a redevelopment project that is subject to a written agreement with the agency or where financial assistance has been provided by the agency, the agency shall, within four years of the destruction or removal, rehabilitate, develop, or construct, or cause to be rehabilitated, developed, or constructed, for rental or sale to persons and families of low or moderate income, an equal number of replacement dwelling units that have an equal or greater number of bedrooms as those destroyed or removed units at afford-

able housing costs within the territorial jurisdiction of the agency . . . .
Cal. Health & Safety Code § 33413(a).

5. If the units were removed or destroyed between September 1, 1989 and January 1, 2002, 75% of the replacement units were required to be affordable at the same or lower income levels as the persons displaced. For any units removed or destroyed after January 1, 2002, 100% of the replacement units must be affordable to the persons displaced. Further, the replacement units must be restricted by recorded covenants to remain affordable at such income categories for the longest feasible time, and not less than 55 years for rental units or 45 years for homeownership units. Cal. Health & Safety Code § 33413(c)(1).

posed ... plan for review and comment by the project area committee, other public agencies, and the general public." *Id.* Thus, the CRL provides a scheme to ensure both public participation and the timely replacement of the lower income units at appropriate affordability levels.

Finally, whenever any lower income housing units are developed pursuant to Health & Safety Code § 33413, a redevelopment agency must require by contract or other appropriate means that the lower income families displaced by the redevelopment project shall have a priority for renting or buying the replacement housing. *Id.* at § 33411.3. The agency also must maintain a list of all persons entitled to such a priority, and may establish reasonable rules for determining the order or priority on the list. *Id.*

### 1. *Applicability of the CRL*

Defendants' primary defense against the plaintiffs' CRL cause of action is that the replacement housing obligations are not applicable to the defendant City. The simple but fatal flaw to this argument is that the plaintiffs never allege that the City is burdened by such obligations, rather, they argue that it is the defendant agency which must act. While it is true that plaintiffs contend that the City was the main protagonist behind the challenged actions, they maintain that the City did not act alone, since the actions at issue were part of downtown redevelopment scheme agreed to by both the Agency and the City. According to plaintiffs, the Agency's obligations under the CRL were triggered by the City's actions because they acted in concert.

■ Contrary to defendants' suggestion, the Agency cannot escape obligations under § 33413 of the Cal. Health & Safety Code simply because the City, and not the Agency, led the code enforcement, closing, and demolition campaign. The CRL makes clear that the provisions of § 33413 are triggered and imposed on the Agency whenever it is a party to a written agreement for a redevelopment project that leads to the removal of low or moderate income housing from housing market, which is plaintiffs' actual allegation. Cal. Health & Safety Code § 33413(a).

■ The defendants also maintain that, even if City actions may trigger the Agency's CRL responsibilities, the actions complained of here cannot do so because they were independent and separate from the downtown redevelopment plan. They maintain that the code enforcement and acquisition activities had nothing to do with the redevelopment plan and were undertaken only in the interest of protecting the health and safety of Stockton's citizens, including plaintiffs. Unfortunately for defendants, both this court and the Ninth Circuit have already rejected this position.

This court has determined that the code enforcement activities were likely "undertaken in connection with the redevelopment of the downtown." PI Order at 25. As explained in that order, both the Redevelopment Agency and the City of Stockton adopted the West End Redevelopment Plan in 1961, which was amended in 1991. *Id.* at 2. The court found that, in pursuit of the downtown redevelopment, the City created a property acquisition list and thereafter it, "and its Redevelopment Agency[,] began a policy of zero tolerance for code enforcement violations in downtown hotels," using a "Community Health Action Team ('CHAT')." *Id.* at 3. After reviewing the defendants' arguments, similar to the ones made here, the court concluded that the "defendants' actions are likely part of a single orchestrated redevelopment plan." *Id.* at 23, n. 14. The Ninth Circuit affirmed, stating that an abundance of evidence supported plaintiffs' claims that the aggressive code enforcement cam-

paign by the CHAT against the downtown residential hotels, acquisition, threatened demolition, and conversion of the hotels to parking lots or other uses are all part and parcel of defendants' West End Redevelopment Plan. Specifically, that court noted that:

> The [district] court ... found ... that the City's "redevelopment activities, which included code enforcement, notices of vacating and demolition, and the acquisition of hotels through purchase and eminent domain proceedings, amounted to a 'single undertaking.'" ... Indeed, "the circumstances strongly suggested" that "the City's goals to redevelop downtown through acquisition of buildings in the area ... precipitated code enforcement." ... Accordingly, the court concluded that Plaintiffs' displacement occurred "in connection with" downtown redevelopment activities. None of these findings are clearly erroneous; indeed, all are amply supported by evidence in the record.

*Price v. City of Stockton,* 390 F.3d at 1116 (quoting PI Order at 2–5, 21–25.)

Accordingly, because the code enforcement activities were likely part of the downtown redevelopment project, plaintiffs may properly seek to hold the Agency liable pursuant to § 33413(a) based on those actions.

### 2. *Written Agreement*

The defendants insist that the Agency cannot be held liable for the City's code enforcement or SRO closing and acquisition activities because the plaintiffs cannot point to any part of an agreement entered into by the Agency that calls for those specific activities. As I explain, defendants' understanding of § 33413 is too narrow and must be rejected.

Contrary to defendants' contentions, there is nothing in the CRL that limits the Agency's § 33413 obligations to only those agreements that specifically outline the removal of low-incoming housing. If that were the case, redevelopment agencies would always be able to circumvent CRL's replacement housing mandate by simply omitting housing removal language from such agreements, even if the redevelopment project that is the subject of the agreement would in fact inevitably lead to low income housing removal. The CRL's plain language clearly does not allow for that result. Section 33413 provides that whenever low or moderate income housing is "destroyed or removed ... as part of a redevelopment project that is subject to a written agreement with the agency or where financial assistance has been provided by the agency, the agency shall ... rehabilitate, develop, or construct ... replacement dwelling units." Cal. Health & Safety Code § 33413(a). Therefore, as long as any part of the redevelopment project results in the removal of low income housing, and the Agency is a party to a written agreement entered into pursuant to that redevelopment project, the Agency must comply with the CRL replacement housing obligations, regardless of which entity actually and directly does the removing.

Here, the plaintiffs have presented sufficient evidence supporting their contention that the Agency entered into an agreement concerning a redevelopment project that led to the removal of low and moderate income housing from the City of Stockton's housing market. As the defendants necessarily concede, the Agency was a party to the West End Redevelopment Plan. Plaintiffs allege, and the court has determined it likely, that the code enforcement and SRO closing and acquisition activities were part of that redevelopment project. Plaintiffs also point to evidence showing both that the Agency played an integral part in the execution of the redevelopment project and that the project has resulted in the

displacement of low and moderate income housing. In July 1998, the defendant City applied to the U.S. Department of Housing and Urban Development ("HUD") for an Economic Development Initiative ("EDI") grant and Section 108 loans to further the downtown redevelopment project, to support the development of a multi-modal transportation station, renovation of the Hotel Stockton, development of a multi-screen movie cinema and retail complex, renovation of the Fox Theater, and the Mercy Charities affordable housing development. Pinkerton Dec., ¶¶ 7, 9, 12; Collins Dec., Exs. 2, 3, 7 and 11. In the application, the City acknowledged that "[t]he EDI and Section 108 funded projects will require the relocation of approximately 200 residential units and 37 businesses ...." Collins Dec., Ex. 2 at DEF 03155. The City also identified the Redevelopment Agency as the lead player in its redevelopment scheme, indicating that "[t]he Redevelopment Agency has a long history of playing the coordination role and as the Agency responsible for the comprehensive project implementation...." *Id.* at DEF 03185. Therefore, the defendants cannot seriously dispute that the Agency did not enter into an agreement of the type contemplated by § 33413.

### 2. *Financial Support*

■ I now examine plaintiffs' contention that the Agency is also subject to § 33413 of the CRL because it provided financial assistance for the redevelopment project which led to the removal of low and moderate income housing.

Plaintiffs point to the City's EDI grant and § 108 loan applications as proof that the Agency helped finance the challenged activities. Collins Dec. ¶ 3, Ex. 2. According to that application, the Agency was to contribute over $2.7 million as matching funds in support of the EDI application. *Id.* at DEF 03183, 03191. Further, in May 2000, the City and the Redevelopment

Agency entered into an agreement whereby the City agreed to grant $14.5 million to the Redevelopment Agency to carry out the redevelopment project, and the Agency agreed to assist the City, as needed, in repaying a $13 million § 108 loan the City obtained from HUD. Collins Dec. ¶ 6, Ex. 5 at 14682–83. The evidence indicates that the Agency provided matching redevelopment funds of over $2.7 million for the EDI grant and secured the § 108 loan. Collins Dec., Ex. 2 at DEF 03183, 03191; Ex. 5 at DEF 15002–03. Accordingly, plaintiffs have sufficiently shown that the Agency financially supported the redevelopment project at issue, thereby triggering § 33413(a).

### B. CRL COMPLIANCE

According to plaintiffs, defendants have violated the CRL in at least three ways: (1) by failing to adopt a replacement housing plan for the SRO's within the time line mandated by § 33413.5, (2) by failing to adopt an adequate replacement housing plan for the Toni Hotel units, and (3) by evading its obligation to assure that the persons displaced to accommodate the downtown redevelopment project actually receive a priority for any replacement units developed pursuant to Health & Safety Code § 33413. I address these contentions below.

### 1. *Adoption of a Replacement Housing Plan*

■ The CRL mandates that the defendant agency replace low and moderate income units removed from the housing market as a consequence of the redevelopment plan within four years. Cal. Health & Safety Code § 33413(a). As noted above, to meet that deadline, the agency must plan for the replacement well in advance of the actual implementation of the redevelopment project.

As plaintiffs assert, the defendants have long since removed hundreds of lower-income residential units from the affordable housing market. *See supra;* PI Order at 4, fn. 3; Collins Dec. ¶ 10, Ex. 9 at 570. By virtue of the statute, the replacement units should have been made available between June 2005 and May 2006, and the plan to meet that deadline should have been adopted years ago.[6]

Defendants admit that, with the exception of the Toni Hotel, the Agency has not adopted a replacement housing plan for any of the units that were removed from the market during the code enforcement phase of the project. Defs.' Opp'n. at 23–25. Therefore, because replacement plans were never adopted, the hundreds of SROs should never have been removed from the low-income housing market. Section 33413.5 is unambiguous in providing that:

A dwelling unit whose replacement is required by Section 33413 but for which no replacement housing plan has been prepared, shall not be destroyed or removed from the low- and moderate-income housing market until the agency has by resolution adopted a replacement housing plan.

Health & Safety code § 33413.5.

■ Plaintiffs also assert that the Agency further violated the CRL when it failed to timely adopt a replacement housing plan for the Toni Hotel. Defendants erroneously assert that the replacement plan must be adopted "at least 30 days prior to *implementing* a project." Burrows Dec. ¶ 12, Ex. 20 at 425 (emphasis added). The statute makes clear, however, that defendants were required to adopt such a plan thirty days prior to the *execution of the agreement* regarding the acquisition or disposition of the hotel. Because plaintiffs provide proof that such an agreement was entered into as early as May, 2000, Collins Dec. ¶ 20, Ex. 19; Burrows Dec. ¶ 12, Ex. 20, defendants may have been required to be adopt a plan as early as April of 2000.[7] Instead, however, defendant agency waited until December 14, 2004, on the eve of demolition, to adopt any replacement housing plan for the eight Toni Hotel SRO units. Burrows Dec. ¶ 12, Ex. 20. Therefore, plaintiffs are likely to succeed on their claim that defendant agency violated the CRL.

#### 2. *Affordability Requirements*

■ The CRL requires that replacement housing be made available to the same or lower income levels as the residents that were displaced. Health & Safety Code § 33413.5. The replacement housing plan for the Toni Hotel provides that the former residents of the Toni Hotel were all very low income, Burrows Dec. ¶ 12, Ex. 20 at 430, and accordingly provides that the replacement housing will be affordable to persons of that income level. Plaintiffs complain that defendants' income level determination is inappropriately based on pure speculation. According to plaintiffs, the former residents of the Toni Hotel may have just as likely been persons with "extremely low," rather than very low incomes. As such, the Toni Hotel replacement units would not be affordable to those former residents.

---

6. Plaintiffs also submit that § 33413.5 was triggered as early as May of 2000, when the City and the Agency entered into the "Subrecipient Agreement" that secured the funding for the redevelopment project because it provided for the removal of at least 200 residential units. Collins Dec. ¶ 6, Ex. 5 at 14682–83.

7. Moreover, the offer to purchase the Toni Hotel was made on November 27, 2001 (Collins Dec. ¶ 14, Ex. 13), and the Toni Hotel site was deeded to the City on March 26, 2002. Burrows Dec. ¶ 4, Exs. 11, 12. Thus, execution of the acquisition agreement, which also can trigger the replacement planning obligation, occurred sometime before March 26, 2002.

The defendants respond that replacing the plaintiffs' proposed gradation of income level to include "extremely low income" is nowhere contemplated by the CRL, and that instead, the statute provides only for "very low income," "low income," and "moderate income." As plaintiffs point out, however, the term "very low income" expressly includes "extremely low income households, as defined in [HSC] Section 50106. . . ." *See* Health & Safety Code § 50105(b). It would appear the defendants have a duty to ascertain the income level of those displaced, and in the absence of evidence that they did so, plaintiffs may well succeed on their claim that defendants violated section 33413(a).

### 3. *Priority Requirements*

■ Plaintiffs also contend that the defendant agency failed to assure that any displaced persons will receive priority for any replacement units produced or replaced, as required by § 33411.3. The named plaintiffs in this case assert that they have never been notified by defendants of their right to have priority for a replacement unit at the Hotel Stockton. Henderson 2005 Dec. ¶ 4; Cobbs 2005 Dec. ¶ 4. Further, according to plaintiffs, all 155 of the replacement units at the Hotel Stockton are restricted to seniors and will only be affordable to very low income persons, thereby denying all displaced persons from a meaningful opportunity to obtain replacement housing. To highlight the detrimental impact of the housing restriction, plaintiffs point out that approximately 70% of the persons recorded on defendants' Relocation Assistance Log are *not* seniors, and are therefore ineligible for the replacement units. Cobbs 2005 Dec. ¶ 3; Henderson 2005 Dec. ¶ 3.

The defendants dispute plaintiffs' contention by citing to a declaration of Steven Pinkerton, director of the City's Housing and Redevelopment department, who states that, although Hotel Stockton was initially planned as senior housing, that restriction was never realized. Pinkerton Decl. §§ 12–14. The record also contains evidence supporting plaintiffs' position, however, rendering this issue a factual dispute. For the purposes of this motion, however, the court determines that the plaintiffs may prevail on this claim.

### C. IRREPARABLE INJURY

■ Defendants contend that the relief sought by the plaintiffs is unwarranted because they will suffer no irreparable harm without it. This court has previously found that defendants' failure to comply with their replacement housing obligations law "works a profound hardship" on plaintiffs. PI Order at 34. Nothing suggests that conclusion was in error.

As set forth in the declarations of plaintiffs Henderson and Cobbs, defendants' failure to comply with the CRL has resulted in repeated instances of homelessness for Henderson. Henderson 2005 Dec. ¶ 5; Cobbs 2005 Dec. ¶ 5. The destruction of additional units of low income housing units without an adequate plan for replacement or reasonable and timely steps to ensure that plaintiffs will receive the benefit of a priority for any newly-developed units continues to threaten plaintiffs with recurring and protracted homelessness.

Defendants insist that presently plaintiffs will suffer only a "harmless delay" in awaiting replacement of their homes. *See* Defs.' Opp'n. at 4–5. Given the circumstances, any delay threatens displacement and homelessness.[8]

---

8. In any event, defendants heartless argument rests on a misreading of the law. Defendants' argument is premised on the notion that even if the Agency adopted a replacement housing plan, it would have four years from the date of *demolition* to replace the units, which defendants estimate to be 2009 or 2010. As

Regarding SROs that are in danger of future vacation, the defendants concede that, without the requested amendment, the replacement housing may be delayed by six months. According to defendants, "[i]t is hard to see how any of the plaintiffs would be irreparably harmed by that kind of delay." Defs.' Opp'n at 5. Sadly, defendants continue to fail to come to grips with the harm that plaintiffs will likely suffer from what defendants characterize as a short delay in replacement housing, giving this court even more cause for concern. Although it may "be hard" for the defendants to "see" how even short-term homelessness can cause harm, in this court's view, it does not take more than common sense to understand the extent of that hardship.

First, it is likely that many of the displacees may not find or be able to afford temporary housing while they await their replacement housing to become available. Indeed, "plaintiff Henderson has experienced repeated bouts of homelessness since his displacement" while awaiting a replacement units. Henderson Dec. ¶ 5. Further, plaintiffs Watson and White have had difficulty in securing an affordable, permanent home. Decls. of Lucinda Watson and Lance White in Supp. of Pls' Mot. to Amend PI (Watson Dec. ¶¶ 3, 4); (White Dec. ¶¶ 2, 3, 6). Such short-term homelessness may result in plaintiffs living in conditions even more deplorable than those found in the units closed by defendants, exposing plaintiffs to illness and other dangers. Further, the loss of opportunity to live in replacement housing that is safe, sanitary, decent and integrated and that is accessible to jobs cannot be underestimated. As put by one court, short-term homelessness can mean the loss of

that opportunity "'to escape the never-ending and seemingly unbreakable cycle of poverty.'" *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1424 (quoting *Banks v. Perk,* 341 F.Supp. 1175, 1185 (N.D.Ohio 1972), *aff'd in part and rev'd in part,* 473 F.2d 910 (6th Cir.1973)).

Moreover, the defendants overlook the harm that stems from depriving plaintiffs of their procedural rights to review and comment on a replacement plan *before* any of the hotels are demolished. Health & Safety Code § 33413.5. As noted, a replacement housing plan must demonstrate where the replacement units will be located, the number and affordability levels of the units to be removed and replaced, and that adequate financing is or will be available to replace the units in a timely manner. *Id.* The proposed housing replacement plan must be made available for review and comment by a Project Area Committee (PAC) comprised of residents, businesses and organizations within the project area, other public agencies and the public. *Id.; see also* Health & Safety Code § 33385. Were defendants permitted to continue to remove low and moderate income housing from the housing market, plaintiffs would plainly be deprived of their right to comment on and advocate for a responsible replacement housing plan.

It is unclear to this court what harm defendants will suffer from being required to obey state law.[9] In any event, plaintiffs' harm far outweighs any hardship defendants may suffer.

Plaintiffs have overwhelmingly shown a likelihood that they will succeed on the merits of their CRL claim and that there is a high likelihood that they will suffer

___

explained above, that calculation is incorrect as to many of the buildings that have already been vacated.

9. I must admit to finding it grotesque to seriously suggest that a political subdivision of the state will suffer cognizable harm from being required to obey state law.

irreparable injury. Because plaintiffs request the same relief pursuant to their federal and state fair housing claims, it is unnecessary for the court to reach the merits of those claims.

## V.

## CONCLUSION

The plaintiffs' motion to amend is GRANTED. Clause two of the preliminary injunctive order dated May 2, 2002 is hereby amended and shall now read: Defendants are ENJOINED from vacating, demolishing, or converting residential hotels and motels in the downtown Stockton areas, including those located in the West End Urban Renewal Project area. The injunction shall remain in effect until the defendants adopt and implement a replacement housing plan and relocation assistance plan in accordance with Health & Safety Code §§ 33413, 33413.5, 33411.3 and 42 U.S.C. § 5304(d), or further order of the court.

IT IS SO ORDERED.